Gary D. GAZAWAY *v.* Gary PUGH, *et al.*

CA 99-672 12 S.W.3d 662

Court of Appeals of Arkansas
Divisions IV and I
Opinion delivered March 15, 2000
[Petition for rehearing denied April 19, 2000.* ]

* NEAL and CRABTREE, JJ., would grant.

*Sharp, Beavers & Cline*, by: *R. Alan Cline*, for appellant.

*John C. Throesch*, for appellees.

ANDREE LAYTON ROAF, Judge. Gary D. Gazaway appeals a decree entered by the Randolph County Chancery Court finding that a public prescriptive easement exists in a gravel road and turn-around area on land owned by Gazaway and others and enjoining the landowners from blocking or interfering with the public's use of the easement. The court also found that because of the State's public policy for protecting archeological sites, further graveling or grading of the road would be excluded from any areas that the Arkansas Archaeological Survey clearly flagged and marked as traversing Native American burial sites and artifacts. On appeal, Gazaway argues that the chancellor: 1) was clearly erroneous in finding that the appellees met their burden in proving that a public prescriptive easement existed; 2) was clearly erroneous in finding that the public's use of the property was not permissive; and 3) abused his discretion in establishing the easement in light of Ark. Code Ann. §§ 13-6-301 *et seq.* and -401 *et seq.* (Repl. 1999). We affirm.

This case involves access to a boat ramp and an area known as "Schaeffer's Eddy" on the Little Black River near Pocahontas. In July of 1994, Gazaway erected a gate on the gravel road that extends from a Randolph County road across his property. Gary Pugh and eight other hunters and fishermen joined together and sued William and Dorothy Bates, whom they believed to have erected the gate, to have the blocked road declared a public prescriptive ease-

ment and to enjoin the landowners from interfering with their use of the road. The Bateses quitclaimed their interest in the property that the roadway traverses to Gazaway, who subsequently joined the lawsuit as a defendant.

At the November 19, 1998, hearing on the petition, Randall Barnett, a twenty-three-year employee of the Randolph County Highway Department, testified that he graded the road in question for several years and hauled gravel to the road. He claimed that the road was graded three or four times a year, as requested.

Jim Andrews testified that he was county judge from 1985 through 1994. He stated that the county would grade the road three to five times a year and place gravel on it as needed. According to Andrews, the road got more attention during duck season, if requested; the county had once widened the road at the request of Dr. Bates; and the county put gravel on the road during the mid-1980s at the request of another member of the Gazaway family.

Seventy-one-year-old Zeldon Rapert testified that he moved into the area in 1942, and his father farmed the land owned by the appellant's grandfather, Cleve Gazaway. He testified that there were six to eight houseboats in the eddy and that trucks traveled over the road every week carrying shells collected by local residents for a button factory in Newport. He also remembered commercial fishing being conducted at the eddy and that trucks often came down the road to pick up fish. He also testified that he used the road for hunting and fishing access to the river and kept his boat there. Rapert claimed that he never knew of anyone having to ask Cleve Gazaway for permission to use the road. Rapert also stated that he used the road to access a ferry located just above the eddy. He also remembered loggers using the road and was unaware of their asking permission. On cross-examination, Rapert stated that Gazaway allowed everyone to use the road. He admitted that the recreational users of the road were mostly family or friends, and that he had no knowledge regarding the arrangements for use of the road by the commercial vehicles.

Gary Cole, an Arkansas Game and Fish Commission enforcement officer, testified that he was familiar with the road since 1980, that the road provides access to the Dave Donaldson Wildlife Management Area, and that it is used year round by sportsmen. The

road, however, received heaviest use during duck season, with seventy-five to one hundred vehicles using it on opening weekend and fifty to sixty during the week, fluctuating with the duck population. He also testified that Dr. Bates asked him to patrol the area more closely in the mid-1980s when he had problems with people trashing the land. He stated that he regarded the Bateses as the owners and that their general attitude was that as long as people respected the property, the Bateses did not mind them using the road.

B.E. Foster, a retired Randolph County road worker, who worked from 1968 to 1984, testified that he graded the road every three or four months and frequently put gravel on it. He stated, however, that regular county roads were graded about once a month. Foster admitted that he did not know who requested the grading, and he also stated that if a private landowner requested grading, the county would do it.

Tommy Campbell, one of the named plaintiffs, testified that he started using the eddy in 1966 or 1967 and that the road was in regular, year-round public use since that time, although it was used more heavily during the duck season. He also said that he knew the Bates and Gazaway family since he was a child and that he never asked permission to use the road.

After the chancellor took Gazaway's directed-verdict motion under advisement, Gazaway presented his case. Gazaway testified that since 1931, his family owned the land over which the road to the eddy passed, and he had succeeded his grandfather, father, and brother in title to the property. He also noted that Dr. Bates was his uncle and had been the caretaker of the property. He stated that Zeldon Rapert was a friend of the family and was never denied access to the property. Gazaway stated that his grandfather "basically" allowed people that the family knew to have access to the eddy. Gazaway stated that prior to 1970, the road was used very little because it was a mud pit, and to the extent that it was used, it was only by Carl Vanderver's farm machinery. He also stated that the location of the road changed during the 1960s when it was adjusted to accommodate farming on the property. He asserted that gravel was not put on the existing road until September 21, 1995, when 312 tons of SB2 was placed on the road, and it was widened from 18 feet to 28.6 feet.

According to Gazaway, he became interested in protecting his property in 1991 when he discovered four vehicles with Missouri plates and the owners "trashing" the area with beer cans and playing loud music. In January of 1994, he stated that he put up a gate to monitor the situation and that he "wanted to possibly make a business out of it," but did not close the gate until July 1, 1994, when he discovered that people were looting Native American artifacts. He stated that prior to the 1990s, the people who used the roads were mostly friends and family and local people, and he kept it open as "kind of a public service." According to Gazaway, in 1995, after consulting with the Arkansas Archaeological Survey, he posted signs on his property that just disappeared, and he stated that he had to run off several artifact looters.

Julie Morrow, Station Archaeologist for the Arkansas Archaeological Survey, testified that the eddy was a significant archeological site and that it had been disturbed by grading or plowing. She noted that artifacts were found on the road bed and opined that continued systematic use of the road by the public would damage the artifact deposits. Thomas Green, Director of the Arkansas Archaeological Survey, testified that the area in question contained three archeological sites, one of which was eligible for the National Register of Historic Places. He also examined bones found in the area and opined that they dated to between 1000 and 1500 A.D. He also stated that the road damaged the archeological site and that if the area was a burial site, it would make no difference as to how long the remains had been placed there.

Carl Vanderver, a resident of the eddy, testified that the main purpose of the road was to provide access for the people who lived, worked, or farmed on the eddy. He claimed he knew most of the people who used the road. Vanderver claimed that until the Game and Fish Commission put chat on the road in the mid-nineties, it was a dirt road and was impassable during bad weather. According to Vanderver, people asked permission to come into the gate and to use the land for hunting and fishing. He stated that prior to 1994, the county would only grade the road if someone asked; however, in 1994 and 1995, the county graveled and graded the road as if it were a county road. David Graham, a lifelong resident of the area, likewise testified that he and other people used the road with the Gazaways' permission. He also testified that the road was just a dirt path until the county graveled and graded it in the mid-1990s.

On appeal, Gazaway argues that the chancellor was clearly erroneous in finding that the appellees met their burden of proving the necessary elements to establish a prescriptive easement in favor of the public and in finding that the public's use of the property was not permissive. Because these points are complementary, we will discuss them together. Gazaway acknowledges that the issue is one of fact; however, he asserts that the facts presented did not prove that the use of the road was adverse to him or his predecessors in title. He contends that there is no evidence of hostility. Moreover, citing *Bridwell v. A. P. & L.*, 191 Ark. 227, 85 S.W.2d 712 (1935), for the proposition that use of a roadway over unenclosed and unimproved land is deemed to be permissive and not adverse to the owners of the land, he asserts that the evidence in this case did not overcome the presumption of permissive use. We disagree.

One asserting an easement by prescription must show by a preponderance of the evidence that his or her use has been adverse to the true owner and under a claim of right for the statutory period. *Johnson v. Jones*, 64 Ark. App. 20, 977 S.W.2d 903 (1998). The determination of whether the use of a roadway is adverse or permissive is a question of fact, and a chancellor's finding with respect to the existence of a prescriptive easement will not be reversed by this court unless it is clearly erroneous. *Id.* Where there is usage of a passageway over land, whether it be by permission or otherwise, if that usage continues openly for seven years after the landowner has actual knowledge that the usage is adverse to this interest or where the usage continues for seven years after the facts and circumstances of the prior usage are such that the landowner would be presumed to know the usage was adverse, then such usage ripens into an absolute right. *Fullenwider v. Kitchens*, 223 Ark. 442, 266 S.W.2d 281 (1954). Moreover, the length of time and circumstances under which the roadway was opened and used are sufficient to establish an adverse use. *Zunamon v. Jones*, 271 Ark. 789, 610 S.W.2d 286 (Ark. App. 1981).

We find this to be a very close case because almost all of the appellees' witnesses were personally acquainted with the Gazaway family, and their testimony about their use of the roadway was not in any way inconsistent with the scope of permission that the Gazaway family at least implicitly extended to them. We also find no significance in the fact that the county graded and graveled the road; there is no dispute that the county regularly provided this

service for private landowners. However, Gary Cole's testimony decisively tips the balance in favor of the appellees. His account of the sheer number of hunters and fishermen present at the eddy suggests that not all of the use was by family or friends. In *Kimmer v. Nelson*, 218 Ark. 332, 236 S.W.2d 427 (1951), the supreme court held that the original restriction in the nature of a permissive passageway across the land of another may be deemed to have been abandoned if such use is not objected to by the landowner after a long passage of time. Similarly, in *Fullenwider v. Kitchens, supra*, the supreme court applied the principle announced in *Kimmer* to uphold a lower court's finding that use of a road through wild and unimproved land for over thirty years overcame the presumption that use of the land was permissive. In the instant case, we find similar acquiescence to longtime use, and therefore we hold that the that the presumption of permissive use had been overcome.

Gazaway also argues that the action taken by the trial court to conform to the requirements of Ark. Code Ann. sections 13-6-301 et seq. and 401 et seq. (Repl. 1999), is "insufficient to protect and preserve these archaeological sites" and is therefore violates these statutes. Further, quoting language in the preamble to Ark. Code Ann. § 13-6-301, he asserts that as an institution of this State, this court has a "duty to exercise its powers and discretion in pursuance of the stated objectives of the statute." This novel argument is without merit.

 First, it is not clear from the order appealed from that Gazaway did not prevail on this issue, in that the order directed measures designed to protect artifacts and burial sites. It is so well settled as to be axiomatic that the prevailing party cannot appeal. *See, e.g., Smith v. Hansen*, 323 Ark. 188, 914 S.W.2d 285 (1996); *Walker v. Kazi*, 316 Ark. 616, 875 S.W.2d 47 (1994). Although Gazaway is now attempting to assert that the trial court's relief is inadequate, we note that he did not file a posttrial motion informing the chancellor that his order is not good enough. However, even if we were to reach this issue, we would decline to accept Gazaway's overly broad interpretation of the statutes and their preamble. The plain language of Ark. Code Ann. § 13-6-303(b) entrusts the protection of artifacts to the criminal-justice system and specifically commands State prosecutors to enforce these laws. We note as well that the protection of burial sites is also expressly

entrusted to the criminal-justice system because Ark. Code Ann. § 13-6-408 makes desecration of a burial site a Class D felony.

Affirmed.

PITTMAN, JENNINGS, BIRD, JJ., agree.

CRABTREE and NEAL, JJ. dissent.

TERRY CRABTREE, Judge, dissenting. I cannot agree with the majority opinion that the appellee established a "public prescriptive easement" or that the order entered by the trial court in this case was consistent with Arkansas Code Annotated section 13-6-301 (Repl. 1999) *et seq*. I agree with the facts as stated in the majority opinion and the statement in the majority opinion that:

> We find this to be a very close case because almost all of the appellees' witnesses were personally acquainted with the Gazaway family and their testimony about their use of the roadway was not in any way inconsistent with the scope of permission that the Gazaway family at least implicitly extended to them. We also find no significance in the fact that the county graded and graveled the road; there is no dispute that the county regularly performed this service for private landowners.

The elements of a prescriptive easement were stated in *Zunamon v. Jones*, 271 Ark. 789, 791, 610 S.W.2d 286, 287-88 (1981) as follows:

> The controlling law of the case before us is stated in *Fullenwider v. Kitchens*, 223 Ark. 442, 266 S.W.2d 281 (1954).
>
> The court in *Fullenwider*, after it reviewed the leading prescription right cases in Arkansas, stated the law as follows:
>
> A consideration of the many opinions of this court regarding the acquisition of a right-of-way over lands makes it clear, in our opinion, that no real conflict exists. All our opinions are in harmony on one point, viz.: Where there is usage of a passageway over land, whether it began by permission or otherwise, if that usage continues openly for seven years after the landowner has actual knowledge that the usage is adverse to his interest or where the usage continues for seven years after the facts and circumstances of the prior usage are such that the landowner would be presumed

> to know the usage was adverse, then such usage ripens into an absolute right.
>
> Zunamon and Chicago Mill argue, and we believe correctly, that the original presumption in favor of a permissive use cannot be rebutted solely by evidence showing the road was used by the public over an extended period of time....

It is clear that something more than use is required. Some act sufficient to put the landowner on notice that the other party, in this case the public, is using the property adverse to the interest of the landowner. In my opinion, the appellees failed to establish that the use was adverse to that of the landowner. The volume of traffic is not sufficient.

I do not agree that the testimony of Gary Cole tips the scales in favor of the appellee. There is no doubt that the appellant established that several people were given permission to use the road to gain access to the eddy and the Dave Donaldson Wildlife Management Area, and that he felt it was a "public service" to allow some of the people access to the area. Are we to penalize the appellant landowner for allowing others to cross his property to enjoy the eddy and the wildlife management area? I find it very disturbing that the "public," referred to in this case, never came forward to testify as to their desire to use the property of another person for purposes of fishing and hunting. The witnesses who testified had some understanding that they had permission to cross the property of the appellant, but nothing other than an assumption supports the conclusion that the others who used the property did so without permission. In my opinion, the adverse nature of the use cannot be presumed when one's property is to be taken by the "public"; on the contrary, the presumption is that the use is permissive. *Id.*

I have even more difficulty with the majority opinion's position on the archeological site. The evidence was clear that the roadway passed over burial grounds that date back 1,000 to 1,500 years. The chancellor in this case did a commendable job trying to balance the interests involved, but unfortunately the interest that lost was that of the burial grounds. The order entered herein would allow a large number of vehicles to pass over the burial grounds on a regular basis, causing irreparable damage to the site. Arkansas Code Annotated section 13-6-304 (Repl. 1999) states, "All state agencies,

departments, institutions, and commissions, as well as all counties and municipalities, shall cooperate fully with the Arkansas Archeological Survey in the preservation, protection, excavation, and evaluation of artifacts and sites." The clear intent of the legislature is to protect the history of our state and the sites that contain artifacts. Perhaps even more persuasive is Ark. Code Ann. § 13-6-308 (Repl. 1999), which states:

> In order that sites and artifacts on state-owned or controlled land shall be protected for the benefit of the public, it is made a misdemeanor for any person, natural or corporate, to write upon, carve upon, paint, deface, mutilate, destroy, or otherwise injure any objects of antiquity, artifacts, Indian painting, or sites. All such acts of vandalism shall be punished as misdemeanors according to the provisions of this subchapter.

In my opinion, it is inconsistent to say that artifacts are any less important when on land privately owned by an individual as opposed to land owned by the State. Surely, the statute should afford the same protection to artifacts on private property, as it does to artifacts on State property when the landowners ask for such protection.

As stated earlier, the road clearly goes over burial grounds. Arkansas Code Annotated section 13-6-408 (Repl. 1999) makes it a misdemeanor to desecrate a burial ground the first time and a felony for subsequent acts; yet, the majority opinion leaves its enforcement to the prosecuting attorney. The issue is solidly before us. In my opinion, an order granting an injunction in this case to prohibit the destruction of the burial grounds would be consistent with the purposes of the statute and the intent of the legislature, and appropriate to address a civil wrong committed by the destruction of a burial site on the appellant's land. Are we to wait even longer so the destruction can be complete by the time an appropriate complaint can be made? Further, what rights have the appellee obtained in this case? According to the majority opinion, they have the right to cross the land of the appellant because of the establishment of a public prescriptive easement, but to do so would be a misdemeanor or felony depending on how many times the person has passed across the burial ground. For this reason alone, I would reverse the trial court. But more importantly, is the appellee in this case willing to commit a misdemeanor or felony to fish the eddy and hunt the wildlife management area? I doubt it.

I dissent.

NEAL, J., agrees.