OWNERS ASSOCIATION of FOXCROFT WOODS, INC., and George R. Riley, Jr. *v.* FOXGLEN ASSOCIATES, an Arkansas General Partnership, and Arthur Hart & Company, P.A.

01–203 57 S.W.3d 187

Supreme Court of Arkansas
Opinion delivered October 25, 2001

*Quattlebaum, Grooms, Tull & Burrow PLLC*, by: *J. Leon Holmes*, for appellants.

*Eichenbaum, Liles & Hester, P.A.*, by: *James H. Penick, III*, for appellees.

ROBERT L. BROWN, Justice. This is an appeal brought by appellants Owners Association of Foxcroft Woods, Inc.

(Foxcroft Woods), and George R. Riley, Jr. (Riley), from a decree entered in favor of appellees Foxglen Associates and Arthur Hart & Company, P.A. (Hart). In that decree the chancery court granted declaratory and injunctive relief, as requested by Foxglen Associates and Hart. The chancery court found that the public had acquired a prescriptive easement in a drive known as the Southern Drive through usage over fifteen years, and based on this easement, it permanently enjoined the appellants from blocking or otherwise interfering with the public's right to access the Southern Drive. The appellants appeal on five grounds: (1) the seven-year period for a prescriptive easement did not begin to run until February 1995; (2) no prescriptive easement was acquired due to no claim of right or notice of a claim of right; (3) any prescriptive easement acquired has been abandoned; (4) appellees are estopped from claiming an easement against Riley; and (5) Riley did not acquire his property subject to the prescriptive easement because the existence of such an easement was not apparent from an ordinary inspection of the premises. We affirm the chancery court.

This case was submitted to the chancery court by agreement of the parties based on the pleadings, a stipulation agreed to by the parties, exhibits and depositions, and arguments and briefs of counsel. The facts of this case are taken from the chancellor's decree and the parties' stipulation. The dispute that gave rise to this litigation stems from nearly two decades of commercial and dense residential development on the north side of Cantrell Road in west Little Rock. There are four separate properties involved in the dispute: the Foxglen Apartments owned by Foxglen Associates; the Foxcroft Woods condominiums associated with the Owners Association of Foxcroft Woods, Inc.; the Foxcroft Village patio homes, one of which was purchased by Riley; and the Hart property owned by Arthur Hart & Company. The Hart property is situated directly on the north side of Cantrell Road. The other three properties are located approximately one-half block north of the Cantrell Road frontage, behind the Hart property. The Foxglen Apartments are to the west of the Foxcroft Village patio homes. The Foxcroft Village patio homes property is an L-shaped tract situated to the west and north of the Foxcroft Woods condominiums. Attached as an Addendum to this opinion is a map depicting the location of these properties.

At the center of this dispute is a drive known as the Southern Drive that runs east and west from the western edge of the Foxglen Apartments east to Foxcroft Road. The Southern Drive was originally paved with curbing in the early eighties and is forty-five feet in width. The drive borders the Hart property to the north and

both the Foxcroft Woods condominiums and the Foxcroft Village patio homes to the south. Approximately five-sixths of the Southern Drive is owned in fee by the Foxcroft Woods condominiums. The remaining one-sixth, at the westernmost end of the drive, is owned in fee by the owner of the southernmost parcel of the Foxcroft Village patio homes, who is Riley. According to the relevant plats and bills of assurance filed by Foxcroft Woods in 1982, the Southern Drive was intended to be a "public service and utility easement[ ]."

From the mid-1980s, the Southern Drive remained open and access to the Southern Drive enabled the residents of Foxglen Apartments and the occupants of the Hart property to turn onto Cantrell Road by way of Foxcroft Road, with a traffic light at that intersection.[1] This meant that these residents and occupants could avoid turning directly onto the often-congested Cantrell Road without a traffic light. The public use of the Southern Drive prompted some response from the Foxcroft Woods condominium residents, the degree and tone of which is a matter of factual dispute in this case. What is clear is that in 1991, residents of four units of Foxcroft Woods condominiums wrote a letter to their Owners Association regarding parking space. They wanted to set up a parking-space-sharing arrangement. In the letter, they noted that parking was very limited, and that this problem was exacerbated by "the fact that the city has a public easement that is heavily traveled as a connector, cut-through, turn around, etc." The only other documentary evidence of complaints from the Foxcroft Woods condominiums residents is a Foxglen Apartments newsletter issued in July 1998. In that newsletter, Foxglen residents were asked to "refrain from accessing Foxcroft residential area via Foxcroft Condominiums and Patio Homes. . . . [W]e continue to receive reports of our residents violating their privacy. It is our understanding that one of their biggest complaints is Foxglen pet owners walking pets on their property." The timing of this letter — July 1998 — indicates that it was not the vehicular but the pedestrian traffic that was being reported to the managers of the Foxglen Apartments, because at the time of the newsletter, the Southern Drive was blocked to vehicular traffic.

---

[1] The chancery court's order refers to the Southern Drive being open to the public for approximately fifteen years. The stipulation of the parties indicates its was open to the public from the mid-1980s to August 1997.

On February 22, 1995, the City of Little Rock's Fire Marshal noted on a Preliminary Site Plan for lots in Foxcroft Woods Addition that the private drive was to be closed with access only by the fire department. In the winter of 1995, William R. Lile and the Fire Marshal specifically agreed that the Southern Drive could be blocked to public usage with only the fire department to have access. On July 17, 1996, Vantage Development Corporation, which was owned by Lile and Dr. Jerry Bradley, bought the southernmost lot of the Foxcroft Village patio homes. In July or August of 1997, Lile placed unattached barricades along the western edge of the Southern Drive, thereby blocking the Southern Drive to traffic from the Foxglen Apartments and the Hart property. These barricades were small orange-and-white striped sawhorses that were not affixed to the property. The sawhorses were up except for a few days in 1997. Sometime before June of 1998, the sawhorse barricades were replaced by a cable spanning the drive. The cable was strung from two small steel poles placed on either side of the drive. From the cable hung a six inch by fifteen inch red-and-white sign reading "PRIVATE DRIVE DO NOT ENTER." From July or August of 1997 forward, the public did not use the Southern Drive to access Foxcroft Road.

In June of 1998, almost one year after the Southern Drive was first barricaded by Lile, Riley bought the southernmost lot of the Foxcroft Village patio homes from Bradley's and Lile's Vantage Development Corporation. Riley bought the property for his mother, who was eighty years old at the time. At the time of Riley's purchase, the Southern Drive was barricaded with the cable and "PRIVATE DRIVE" signs. It was also barricaded in that fashion when he visually inspected the lot before purchasing it. Riley never saw the drive in its former functional state. He asked a resident of Foxcroft Woods condominiums, Reggie Clow, how long the cable had been up, and he learned that the cable had been in place "for over a year."

At the time of Riley's purchase in June 1998, a patio home was partially constructed on the lot. Upon completion of the patio home, Mrs. Riley moved into it. The Southern Drive was ten to twelve feet from her patio home. Mrs. Riley, according to her deposition testimony, would never have wanted that property to be her permanent residence if she had known that there was a possibility that traffic would be using the Southern Drive.

In April 1999, Riley and Foxcroft Woods built a wooden privacy fence across the Southern Drive, which replaced the cable and signs. It is this fence that sparked the present litigation. On June

24, 1999, Foxglen Associates and Hart filed the suit for declaratory judgment and injunctive relief against Foxcroft Woods and Riley, which is the subject of this appeal. The specific relief requested was for Riley to take down the privacy fence. Foxglen Associates and Hart contended, first, that the relevant plats and bills of assurance created a recorded easement over the Southern Drive in their favor. Next, they asserted that the public's continuous use of the Southern Drive from 1982 to 1997 created a prescriptive easement.

In its decree, the chancery court concluded that the plats and bills of assurance did not create a recorded easement justifying the public's use of the Southern Drive. Rather, the court found that the recorded easement was limited to public service usage, including emergency and utility vehicles. However, the court did find a prescriptive easement in the public's favor. The court issued the injunction, as Foxglen Associates and Hart requested, to remove any barricade from the Southern Drive but stayed the injunction's enforcement pending this appeal. Foxglen Associates and Hart did not cross-appeal from the chancery court's adverse ruling on the recorded easement.

### I. Seven-Year Period

For their first point, Foxcroft Woods and Riley contend that the seven-year period for a prescriptive easement did not begin to run until February 1995 because that is when they were first entitled to block the drive. We disagree.

■ We first discuss our standard of review in chancery cases. This court reviews chancery cases *de novo* on the record but will not reverse a finding by the chancery court unless it is clearly erroneous. *O'Fallon v. O'Fallon*, 341 Ark. 138, 14 S.W.3d 506 (2000); *Slaton v. Slaton*, 336 Ark. 211, 983 S.W.2d 951 (1999). A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been committed. *Slaton v. Slaton, supra*; *RAD-Razorback Ltd. Partnership v. B.G. Coney Co.*, 289 Ark. 550, 713 S.W.2d 462 (1986). It is this court's duty to reverse if its own review of the record is in marked disagreement with the chancery court's findings. *Dopp v. Sugarloaf Mining Co.*, 288 Ark. 18, 702 S.W.2d 393 (1986) (citing *Rose v. Dunn*, 284 Ark. 42, 679 S.W.2d 180 (1984); *Walt Bennett Ford v. Pulaski County Special School District*, 274 Ark. 208, 624 S.W.2d 426 (1981)).

Foxcroft Woods and Riley argue that the chancery court erred in concluding that the time period for the public's prescriptive easement began to run before the Little Rock Fire Marshal gave his permission in 1995 to block the Southern Drive. The chancery court found that the running of the prescriptive easement time period began in the mid-80s, when vehicular traffic began using the Southern Drive to avoid Cantrell Road. We note on this point that all parties stipulated to the following: "From the mid-1980s, the southern drive remained open, and was used by the public for ingress and egress, between Foxcroft Road on the east, and the commercial and multi-family properties to the west, on a regular basis until unattached barricades were put up in August of 1997."

The argument of Foxcroft Woods and Riley apparently is that they knew that a recorded easement existed for public service, emergency, and utility vehicles. Thus, they believed they could not block the Southern Drive *in any respect* until they learned that the City Fire Marshal had agreed that a blockade was permissible in February 1995. This being the case, they reason that they operated under a disability to in any way interfere with the drive until February 1995. Since they operated under this disability until that time, they contend that the seven-year period for a prescriptive easement could not begin to run before that date.

This argument fails under scrutiny. Even accepting the fact that a recorded easement for public service and utility vehicles was not waived until February 1995, the recorded easement did not prevent Foxcroft Woods and Riley from taking steps to limit vehicular traffic to public service and utility vehicles before that time. They could have posted signs to that effect, written letters, or taken other comparable measures, as Foxglen Associates and Hart correctly argue in their brief. They could also have gone into court to protest the public's use of the drive. Instead, they did nothing for the approximately fifteen-year period during which time the public's right to use the Southern Drive ripened into a prescriptive easement.

Foxcroft Woods and Riley cite this court to *Barbee v. Carpenter*, 223 Ark. 660, 267 S.W.2d 768 (1954), in support of their argument, but that case is readily distinguishable. In *Barbee*, the Carpenter family built a fence across a city street which had never been a through street but rather had served as a cul-de-sac driveway for the Carpenter family as well as for the Barbee family who lived across the street. The Carpenter family held fee title to the cul-de-sac. The Barbee family sued under a prescriptive easement theory to force the Carpenters to remove the barricade across what had been

their mutual driveway. We pointed out in our opinion that until 1940, the Carpenters' predecessor in interest to the cul-de-sac land had held defective title to that portion of his land in that the metes and bounds description was inaccurate. Thus, he was "not legally in a position to protest" his neighbors' use of his driveway until 1940. In the instant case, however, Foxcroft Woods and Riley were under no disability to contest *the public's* use of the Southern Drive. Any disability they were operating under only pertained to public service and utility vehicles.

We affirm the chancery court's ruling on this point.

## II. Claim of Right and Notice

For their second point, Foxcroft Woods and Riley contend that the chancery court's decision on the prescriptive easement was error because Foxglen Associates and Hart had no claim of right. They further argue that the appellees gave no notice of their claim and that the fact they ceased using the drive when it was barricaded indicates that the usage had been permissive all along.

 A prescriptive easement may be gained by one not in fee possession of the land by operation of law in a manner similar to adverse possession. *See* Paul Jones Jr., *Arkansas Titles to Real Property* §§ 714, 1499, at 443, 906-09 (1935 & Supp. 1959); *Neyland v. Hunter*, 282 Ark. 323, 668 S.W.2d 530 (1984) ("Prescription is the acquisition of title to a property right which is neither tangible nor visible (incorporeal hereditament) by an adverse user as distinguished from the acquisition of title to the land itself (corporeal hereditament) by adverse possession."). Like adverse possession, "prescriptive easements . . . are not favored in the law, since they necessarily work corresponding losses or forfeitures in the rights of other persons." 25 AM. JUR. 2d *Easements and Licenses* § 45 (1996); *Potts v. Burnette*, 301 N.C. 663, 273 S.E.2d 285 (1981). In Arkansas, it is generally required that one asserting an easement by prescription show by a preponderance of the evidence that one's use has been adverse to the true owner and under a claim of right for the statutory period. *Manitowoc Remanufacturing, Inc. v. Vocque*, 307 Ark. 271, 819 S.W.2d 275 (1991); *Neyland v. Hunter, supra; Teague v. Raines,* 270 Ark. 412, 605 S.W.2d 485 (1980). This court has said that the statutory period of seven years for adverse possession applies to prescriptive easements. *Neyland v. Hunter, supra; Duty v. Vinson*, 228 Ark. 617, 309 S.W.2d 318 (1958); *Brundidge v. O'Neal*, 213 Ark. 213, 210 S.W.2d 305 (1948). That statutory period for adverse

possession is set out in Ark. Code Ann. § 18-61-101 (1987). *See also* Ark. Code Ann. § 18-11-106 (Supp. 1999) (enacted as Act 776 of 1995).

Overt activity on the part of the user is necessary to make it clear to the owner of the property that an adverse use and claim are being exerted. *Stone v. Halliburton*, 244 Ark. 392, 425 S.W.2d 325 (1968). Mere permissive use of an easement cannot ripen into an adverse claim without clear action, which places the owner on notice. *Manitowoc Remanufacturing, Inc. v. Vocque, supra; Fullenwider v. Kitchens,* 223 Ark. 442, 266 S.W.2d 281 (1954). Some circumstance or act in addition to, or in connection with, the use which indicates that the use was not merely permissive is required to establish a right by prescription. *Craig v. O'Bryan,* 227 Ark. 681, 301 S.W.2d 18 (1957). The determination of whether a use is adverse or permissive is a fact question, and former decisions are rarely controlling on this factual issue. *Duty v. Vinson, supra; St. Louis Southwestern Ry. Co. v. Wallace,* 217 Ark. 278, 229 S.W.2d 659 (1950); *Brundidge v. O'Neal, supra.* The plaintiff bears the burden of showing by a preponderance of the evidence that there has been adverse, not permissive, use of the land in question. *Duty v. Vinson, supra; Brundidge v. O'Neal, supra; Stone v. Halliburton, supra.*

Foxcroft Woods and Riley urge that no prescriptive easement was acquired because there was no claim of right by the users of the Southern Drive and no notice to the owners that the usage was adverse. In making this argument, the appellants claim that the usage was permissive, not adverse, and that the usage, as a result, could not metamorphosize into a prescriptive right. They point specifically to the fact that the appellees and the public at large ceased using the Southern Drive for twenty-one months once it was barricaded. They also point to the 1998 Foxglen Apartments newsletter where apartment residents were advised not to violate the privacy of the residents of Foxcroft Woods condominiums and patio homes by walking pet animals or otherwise. This, they contend, was an admission by Foxglen Associates that its apartment residents were not entitled to access Foxcroft Road by means of the Southern Drive.

We view this argument by the appellants to be akin to their argument that any prescriptive easement was abandoned, which is discussed under Issue III. But, in addition, we do not agree that the chancery court's finding that a prescriptive easement was established was clearly erroneous. The chancery court discounted the appellants' arguments and made these findings and conclusions in its decree:

> When there is usage of a passageway over land, whether it be by permission or otherwise, if that usage continues openly for seven years after the landowner has actual knowledge that the usage is adverse to his interest or usage continues for seven years after the facts and circumstances of the prior usage are such that the landowner would be presumed to know that the usage was adverse, then such usage ripens into a prescriptive easement. Moreover, there is no requirement that a person claiming a prescriptive easement openly communicate their intentions. *Gazaway v. Pugh,* 69 Ark. App. 297 (2000). Here, the usage of the Southern Drive continued for approximately fifteen years, under circumstances such that the owners of the Southern Drive would be presumed to know that the usage was adverse to them, therefore, a prescriptive easement was established.

The chancery court relied on a court of appeals case, *Gazaway v. Pugh,* 69 Ark. App. 297, 12 S.W.3d 662 (2000), in reaching its decision. In that case, the court of appeals held that the sheer number of users of a passageway operated to put an owner on notice that the public's use was adverse to the owner's title. *Gazaway v. Pugh, supra.* In *Gazaway,* a public prescriptive easement was found against the owner of the land over which many duck hunters seasonally passed. The landowner maintained that he had given permission for family members and friends to use the passage over his land. However, the court found that the large number of users of the road meant that the landowner could not, as a practical matter, have given each of them permission to use the land. Additionally, the court held that there had been "acquiescence to long-time use," and thus a prescriptive easement in favor of the public accrued over the land. *Gazaway,* 69 Ark. App. at 303, 12 S.W.3d at 666.

The same principle holds true in the case at hand. We agree with the chancery court that the owners of the Southern Drive would be presumed to know that the public's usage was adverse to them from the mid-1980s to August of 1997. We conclude that the public use of the Southern Drive for this period of time was sufficient notice of a claim of right.

### III. Abandonment

Foxcroft Woods and Riley next posit that even assuming a prescriptive easement came into effect, it was abandoned by Foxglen Associates and Hart. Specifically, they contend that when the

public stopped using the Southern Drive in the summer of 1997 and continued nonusage for twenty-one months, this was proof of abandonment. In short, the appellants urge that the affirmative act of nonusage by the public, including the appellees, was inconsistent with any claim under a prescriptive easement. Moreover, they contend that an act inconsistent with the public's use, such as barricading a drive, need not continue for the statutory period of seven years.

The chancery court dispensed with the argument of Foxcroft Woods and Riley by observing that for an abandonment to be effective, it must occur for a period of time equivalent to the statutory period necessary to create a prescriptive easement, which is seven years, and nonuse did not continue for that period of time. We agree.

 Our law is clear on this point. Once gained, a prescriptive easement may be abandoned by more than seven years of nonuse. *Weir v. Trucks*, 255 Ark. 494, 500 S.W.2d 923 (1973). Such abandonment allows the owner to reenter and prevent the holder of the former easement from reestablishing its prescriptive right to the use of the roadway. *Johnston v. Verboon*, 269 Ark. 126, 598 S.W.2d 752 (1980); *McLain v. Keel*, 135 Ark. 496, 205 S.W. 894 (1918).

 Foxcroft Woods and Riley, however, contend that barricading a passageway, as distinguished from mere nonuse, obviates the need to satisfy the seven-year period. We do not agree that that is the law. This court has previously addressed this point with respect to the fencing or gating of a strip subject to a prescriptive easement. In *Hoover v. Smith*, 248 Ark. 443, 451 S.W.2d 877 (1970), we said:

> [A] prescriptive easement may be barred after maintenance of a gate *for more than seven years*, without any action by one claiming the easement to prevent the obstruction, and that failure to take such action during that period constitutes an abandonment of the easement.

*Hoover*, 248 Ark. at 446, 451 S.W.2d at 879 (emphasis added) (citing *Munn v. Rateliff*, 247 Ark. 609, 446 S.W.2d 664 (1969)). *See also Kennedy v. Crouse*, 214 Ark. 830, 832, 218 S.W.2d 375, 376 (1949) ("We have held that if the general public acquiesces for more than seven years in the existence of a gate across a road established by prescription, its conduct amounts to an abandonment of the prescriptive right, entitling the owner to close the gate permanently.");

*Simpson v. State*, 210 Ark. 309, 310, 195 S.W.2d 545, 545 (1946) ("Any prescriptive right that the public might have acquired in this road prior to 1928 or 1929 was lost by it when appellant, without objection on the part of the public, was permitted to erect the gates . . . and thereafter for a period of seven years . . . maintain them across this road."); *Porter v. Huff*, 162 Ark. 52, 54, 257 S.W. 393, 393 (1924) ("[The holder of the easement] lost any right it may have acquired by acquiescing in a permissive use thereof for a period of more than seven years after the road was closed by gates.").

▉ The argument of Foxcroft Woods and Riley implicitly calls for us to reverse this long line of cases and hold that merely gating a prescriptive easement will dictate abandonment because it is an inconsistent act. We decline to do so and will adhere to our clear precedent on this point. In the instant case, it is undisputed that traffic on the Southern Drive did not stop for seven years. There were only twenty-one months, at most, of nonuse before Riley put up the fence. The chancery court correctly decided this point.

## IV. Estoppel

Appellants argue for their next point that Foxglen Associates and Hart knew that the southernmost patio home lot was being sold, and they said nothing about their intention to resume use of the Southern Drive. The appellants assert that this silence estops Foxglen Associates and Hart from breaking their silence at such a late date, after the patio home had been sold to Riley and residence in the home has been established.

▉ Equitable estoppel requires that an innocent person be misled to his or her detriment, so that it would be inequitable to permit the person estopped to change an original position. *Exchange Bank & Trust Co. v. Gibbons*, 228 Ark. 454, 307 S.W.2d 877 (1957). In order to prove estoppel, the party asserting the defense must prove the following elements: (1) the party to be estopped knew the facts; (2) the party to be estopped intended that the conduct be acted on; (3) the party asserting the estoppel was ignorant of the facts; and (4) the party asserting the estoppel relied on the other's conduct and was injured by that reliance. *Bedford v. Fox*, 333 Ark. 509, 970 S.W.2d 251 (1998); *Foote's Dixie Dandy Inc. v. McHenry*, 270 Ark. 816, 607 S.W.2d 323 (1980). *See also Parker v. Parker*, 75 Ark. App. 90, ___ S.W.3d ___ (2001). The conduct of

the party to be estopped may consist of declarations or admissions, or failure to act or speak. *American Cas. Co. v. Hambleton*, 233 Ark. 942, 349 S.W.2d 664 (1961). The second element of estoppel has been alternatively stated as follows: The person to be estopped must intend that his conduct shall be acted on or must so act that the party asserting the estoppel had a right to believe it is so intended. *Foote's Dixie Dandy Inc. v. McHenry, supra.*

■ The chancery court determined that equitable estoppel would not pertain in this case because Foxglen Associates and Hart were strangers to the transaction for the sale of the patio home that occurred between Riley on the one hand and Bradley and Lile on the other. The chancery court is correct. Foxglen Associates and Hart were not parties to the sale of the patio home to Riley. Yet, the appellants argue that the second element was met because Foxglen Associates and Hart intended by their silence to induce Riley to buy the patio home. This argument requires this court to speculate unduly. There is nothing in the record to show that the appellees (1) knew of the specific pending transaction between Riley and Bradley and Lile, (2) deliberately held their tongues as to the past use of the Southern Drive, and (3) did so with the intent of inducing Riley to buy the patio home property from Bradley and Lile. Were we to subscribe to the appellants' theory that Foxglen Associates and Hart intended reliance on their silence, we would be engaging in rank conjecture.

We decline to extend the doctrine of equitable estoppel to the facts of this case.

### V. Apparentness

For their final point, appellants take issue with the chancery court's finding that the easement along the Southern Drive was apparent upon an ordinary inspection of the lot, and that due to this apparentness, Riley was on notice of the drive's history and had a duty to inquire. Riley points to the cable and signs across the Southern Drive blocking traffic at the time. Despite the fact that the Southern Drive was paved and curbed, he argues that he was not put on notice of the possibility of the lot being encumbered with an easement. Riley further emphasizes that he asked about the status of the drive and was told that it had been closed for "over a year."

■ ■ This court has held that when ordinary inspection of the premises by a purchaser, followed by reasonable inquiry, would

reveal the existence of a servitude, then that purchaser is charged with notice. *Armstrong v. McCrary*, 249 Ark. 816, 462 S.W.2d 445 (1971) (citing *Hannah v. Daniel*, 221 Ark. 105, 252 S.W.2d 548 (1952)). When a person has knowledge sufficient to lead him or her to a fact, that person will be deemed to know it. *Hannah v. Daniel, supra; Waller v. Dansby*, 145 Ark. 306, 224 S.W. 615 (1920). Whether or not an easement is apparent is a question of fact. *Diener v. Ratterree*, 57 Ark. App. 314, 945 S.W.2d 406 (1997).

The chancery court made the following findings on this point:

> George Riley, Jr. is not an innocent purchaser for value. By his own testimony, he was aware of the significance of the open access and non-permanent cable (i.e., it was "apparent"), as evidenced by his inquiry of Reggie Clow. Further, the Owners Association of Foxcroft Woods, through Bill Rea, its president, was well aware of the long and continuously uninterrupted public use. Therefore, Riley cannot contend that the easement was not apparent. As a result of the "apparentness" of the nature of the easement, the law mandates that Mr. Riley exercise ordinary care and diligence in inquiring into the nature of the potential encumbrance. After learning only that the cable had been up for "over a year," Mr. Riley testified that he did not inquire into anything further, such as why a permanent barrier had not been put up across the access area, nor did Mr. Riley seek to determine or verify the time period the Southern Drive had actually been blocked, or ask how the open access came to be "private." Considering Mr. Riley contends he would not have purchased the property if he had known the nature of the public access, his actions clearly did not meet the standard of ordinary care and diligence required under *Diener v. Ratterree, supra; Waller v. Dansby, supra; Hannah v. Daniel, supra*; and *Childress v. Richardson, supra*. These facts, in addition to the apparent age of the numerous commercial projects abutting or surrounding the Southern Drive, along with the paved, curbed, and open nature of the access with no permanent barrier, provided Mr. Riley with more than sufficient information to lead him to the true facts, that the cable had only been up less than a year, and that the Owners Association of Foxcroft Woods, Inc. had been aware of the public nature of the access for several years, all facts of which Reggie Clow and Bill Rea were aware, based on the minutes of the Foxcroft Property Owners Association and their depositions.

We cannot say that the chancery court clearly erred in finding that Riley was on notice of the potential for an easement burdening his land. There was a paved asphalt road with curbs

running across a portion of his lot. That fact alone was sufficient to put Riley on notice. Further, the manner in which the road was blocked was not permanent. There were no posts sunk in the middle of the road, permanently blocking traffic. And the fact that Riley was told that the Southern Drive was closed for over a year begs the question of what was its status before then. We decline to reverse the chancery court on this point.

Affirmed.

GLAZE, J., not participating.

[Illustration] Foxglen Apartment Property

[Illustration] Arthur Hart Property

[Illustration] Foxcroft Village

[Illustration] Foxcroft Woods