2009 Ark. App. 515

**CHARLES R. GRIFFITH FARMS, INC., Appellant,**

v.

**Edward GRAUMAN, Appellee.**

**No. CA 08–497.**

Court of Appeals of Arkansas.

June 24, 2009.

Schieffler Law Firm, by: Edward H. Schieffler, West Helena, for appellant.

David Solomon, Helena, for appellee.

WAYMOND M. BROWN, Judge.

This case involves a four-acre tract of land located in Phillips County, Arkansas. The disputed property is described as:

> Beginning at the Southeast Corner of the SE 1/4 of Section 25, T3S–R3E, Phillips County, Arkansas as established by Survey made by Cline–Frazier Inc. in February 2005, thence N89°34′19″W 2634.62 feet to a point on the East right of way line of Arkansas Highway 20; thence S49°39′14″W 35.9 feet along said East right of way line to a point; thence S87°52′59″E 2720.0 feet to a point; thence N1°10′43″W 156.3 feet to a point on the South line of the SW 1/4 of Section 30, T3S–R4E, Phillips County, Arkansas as established by said Cline–Frazier Survey; thence N89°31′04″W 52.2 feet to a point; thence S0°03′W 52.8 feet to the point of beginning, containing a total of 4.0 Acres, more or less.

Appellee Edward Grauman filed a complaint against appellant Charles R. Griffith

Farms on September 14, 2006, alleging that appellant was holding the disputed property adversely. Appellee's complaint stated:

[2][H]e and his predecessors in title have been in possession to said lands for over twenty years and have claimed it adversely having been in possession of it until [appellant's] actions claiming it as his own and such possession has been notorious, distinct, exclusive, hostile, with the intent to hold adversely against the true owner if it is determined that the record title is not in Plaintiff.

Appellant Charles Griffith filed an answer on September 28, 2006, stating that he and his predecessors "have always owned this land."

The trial took place on June 27, 2007. Paul Gunn, a consulting engineer and registered land surveyor, testified that he prepared a plat of the disputed property. Gunn stated that Harry Stephens, appellee's tenant, showed him a "drainage ditch or something" on the south side of appellee's property that is "suppose[d] to be the line that had been used and agreed upon and then we went over [to] the western side of the highway and discussed what needed to be done." Gunn said that it was too wet at that time to do anything so he and his crew came back a month later. Gunn testified that he got with Stephens and they "located with Mr. Frazier's monuments in relation to the plat that had been prepared and located the property line, according to [appellee]." Gunn stated that he "went across the highway and found Grauman['s] southwest corner and [that he] came across to the easternly side of the ditch area that was the line according to Grauman." Gunn testified that he located "the actual small drainage ditch running east and west" and he also located a "drainage canal or ditch running north and south, which [appellee] said has always been the line" on the "easterly side." Gunn stated that he was able to determine the extent of appellant's encroachment based upon the plat he prepared. Gunn said that he wrote a legal description of the disputed area once he established the survey line.

[3]On cross, Gunn stated that he did not interview anyone else concerning the agreed upon line. He said that appellee indicated to him that the ditch line used had "been used between him and his neighbor as agreed upon and accepted for numerous years." Gunn testified that his intention was to "locate that with relation to Mr. Frazier's survey and indicate that on the plat." Gunn acknowledged that appellee told him where the line should run. Gunn stated that he did not have any personal knowledge as far as where the boundary line was. According to Gunn, the only monument he found on the east side was Mr. Frazier's marker. Gunn testified that Mr. Frazier's plat showed a "52.8 feet offset" that matched the Government Land Office (GLO) notes. Gunn stated that the north and south boundaries of each section did not line up on the GLO notes due to the way "they would start laying out their mile section" and as a result, the line was staggered. Gunn said that Mr. Frazier placed a pin at the location of the offset but he did not intercept that pin. According to Gunn, he came from another direction. Gunn testified that the eastern boundary of appellee's property is 2,761.15 feet, more than 100 feet the length of a "normal section," which is 2640 feet. Gunn stated that his plat did not correct for the "GLO offset between section 30 and 25." Gunn further stated that the east line on his plat "does not make notations of the GLO verification or corroboration, we just show the distance."

Harry Stephens testified that he was familiar with the disputed property because he and his sons had leased the prop-

erty from appellee and farmed it for several years. According to Stephens, he farmed the disputed property for three out of four years, until appellant moved the line. Stephens stated that when the line moved, he informed appellee immediately. Stephens described the line as consisting of some trees and a small ditch. Stephens said he "farmed one side and [appellant] farmed on the other side."

On cross, Stephens stated that he signed a lease with appellee on February 21, 2003. According to Stephens, he did not know who planted first that year. He stated that "[w]hoever planted first, the next farmer would plant adjoining to them. Nobody plowed up anybody else's crops. Nobody said lets agree on where the line is." Stephens testified that the straightness of the line depended on the expertise of the tractor driver. When questioned about the area of appellee's farm as portrayed on the Farm Service Agency (FSA) August 1995 area map, Stephens stated that he provided the FSA map to the flying service to point out the location of his fields. Stephens testified that the lines on the map "could be off pretty good" and that he could not say "that the lines are the same."

Edward Grauman testified that he first came in contact with the disputed property after the May 24, 1946 deed, to his father and uncle. Appellee stated that he had "handled the property since the early 60's." According to appellee, he farmed the property from 1962 to 1973; appellee began leasing the property in 1973. Appellee testified that he was familiar with the boundary line of the farms because it had been the same boundary "since the early 60's." Appellee stated that he had always considered his boundary "a straight line running from east of the thicket all the way to the west and intercepts with the tree line on the west side of Highway 20." Appellee further stated:

No one has ever told me that the lines— the way that I farmed the farm, my predecessors farmed the farm and my renters farmed it after I stopped farming in 1973, no one has ever told me that any of the lines were wrong until this situation arose right here. Nobody told me that there was any offset in these lines or anything of that nature. There has never been any dispute about the lines on that farm up until this point.

Appellee stated that he has claimed ownership and has been in possession of the disputed property for over forty years.

On cross, appellee stated that the area depicted in Defendant's Exhibit 8 [1] was not of the whole farm, but was only a part of the farm. According to appellee, Section 25 was on the western part of the farm. Appellee testified that if he was "standing down on the farm right now" he could not tell what township, section, or range he was in. Appellee went on to say that he "could tell you exactly where [he] was, and [he] could tell you exactly if it was [his] own farm property[.]" Appellee stated that he was claiming everything that was in "the legal description in any section that's mentioned there." Appellee said that it was essentially agreed that "wherever the crop was first planted for that year[,][t]he one next to it would plant next to it."

On re-direct, appellee stated that he claimed ownership of the disputed property, which he had been in possession of for fifty years.

On re-cross, appellee stated that he did not know who planted first each year. However, he stated that he could testify that they adhered "to that boundary line of the thicket and the ditch that ran in a

---

1. Defendant's Exhibit 8 depicted Section 25, Township 3 South, Range 3 East.

westerly direction." Appellee testified that he farmed the north side of the ditch and the "other people farmed on the south side." Appellee stated that after he stopped farming in 1973 and rented out his property, his renters farmed the same way. Appellee testified that the planting line was generally a straight line.

The plaintiff rested and Stephens was called up for the defense. Stephens testified that he used the FSA area map to certify to the federal government; however, he stated that the map was scaled differently for the flying service so that the fliers would know which field to go to.

On cross, Stephens stated that the "map for certification does not make a difference about where the true boundary line is, it just shows what's my farm."

Mike Griffith testified that they started farming adjacent to appellee's land in 1999. He stated that he did not observe anything at that time that established a line. He testified that in 1999, the line was established by first come, first serve. Mike stated that he never talked to appellee about who would plant first. He said that everyone pretty much planted in the same location every year and they tried to get the line as straight as they could. Mike testified that there was never a "dispute about being on somebody's property. We just planted."

On voir dire, Mike stated that the line was not moved until after the land was surveyed in 2005. Upon direct examination, Mike stated that he was usually the one who planted the crop and that he just went to a point down there and the guy next to him planted beside him. He testified that the line varied four or five feet from year to year.

On cross, Mike stated that when he leased the land in 1999, his landlord did not point out where the lines were. He said that Herbie Graham was renting appellee's property during this time and they did not have any dispute over the line. According to Mike, there was a low spot on the property, which varied from year to year. Mike testified that he rented the property until Griffith Farms purchased it in 2005. He stated that the Cline–Frazier survey revealed that the other side of the ditch also belonged to Griffith Farms. According to Mike, Griffith Farms was claiming the line following the 2005 survey.

On re-direct, Mike stated that the low spot was never dug out as a ditch. He said that the wetness of the "spot" determined where the planting was. Mike testified that after the Cline–Frazier survey established the line, they planted up to it.

Charles Griffith testified that before the 2005 survey, "the line was whoever planted first where they want to, and the other people planted beside him." He stated that it was basically the same spot every year but that it would depend on the condition of the soil. According to Charles, the "rule was the first one there was the one that planted and the other one accepted that and just planted next to it."

On cross, Charles stated that there had never been a line. He testified that prior to the survey, they farmed up to the wet spot; the survey revealed that the wet spot was on their property.

Randy Palmer, survey crew chief for Cline–Frazier, testified that he surveyed Griffith's property using the GLO notes. He stated that he noticed a low spot in the field, which looked like where water drained. According to Palmer, there was nothing to support the south line drawn on Gunn's plat.

On cross, he stated that he referred to the old GLO office notes to determine how much of an offset is in a township.

On re-direct, Palmer stated that there is a difference in his survey and Gunn's sur-

vey because "Gunn went to the ditch and [he] went to where GLO told [him]." He stated that the disputed "4 acres is a little slice or triangle" in Section 36.

James Frazier testified that he was a professional surveyor. Frazier stated that the Cline–Frazier plat correctly depicted the south line of appellee's property and the north line of appellant's property.

On cross, Frazier stated that they did not find anything to "show claimed possession on the south line." He also said that Gunn surveyed what "someone told him to survey."

On rebuttal, Gunn stated that appellee showed him the low area or ditch and stated that it was the recognized boundary. Gunn said that the line did not fit GLO dimensions "going north and south and on the easterly line it is long."

On cross, Gunn stated that if he had used the GLO notes, he would have come to the spot on the Cline–Frazier survey. Gunn stated that the difference in the two surveys is that he relied upon the agreed upon boundary.

The Phillips County Circuit Court entered an order on October 3, 2007, finding that the disputed property belonged to appellee and that appellant had no interest or ownership in that property. Appellant made a request for findings of fact on October 13, 2007. The findings of fact were filed on October 30, 2007. Appellant timely filed its notice of appeal on November 21, 2007.

■■ We review land dispute cases de novo on the record, and we will not reverse a finding of fact by the trial court unless it is clearly erroneous. *McWhorter v. McWhorter*, 351 Ark. 622, 97 S.W.3d 408 (2003); *Myrick v. Myrick*, 339 Ark. 1, 2 S.W.3d 60 (1999). In reviewing a trial court's findings, we give due deference to that court's superior position to determine the credibility of the witnesses and the weight to be accorded to their testimony. *Id.* Disputed facts and determinations of witness credibility are within the province of the fact-finder. *Id.* A finding is clearly erroneous, when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been committed. *Owners Ass'n of Foxcroft Woods v. Foxglen*, 346 Ark. 354, 57 S.W.3d 187 (2001); *RAD–Razorback Ltd. Partnership v. B.G. Coney Co.*, 289 Ark. 550, 713 S.W.2d 462 (1986). It is this court's duty to reverse if its own review of the record is in marked disagreement with the trial court's findings. *Dopp v. Sugarloaf Mining Co.*, 288 Ark. 18, 702 S.W.2d 393 (1986) (citing *Rose v. Dunn*, 284 Ark. 42, 679 S.W.2d 180 (1984); *Walt Bennett Ford v. Pulaski County Special School District*, 274 Ark. 208, 624 S.W.2d 426 (1981)).

■■ In order to prove ownership of land by adverse possession, the party claiming possession must show continuous possession of the property for seven years. *Robertson v. Lees*, 87 Ark.App. 172, 183, 189 S.W.3d 463, 471 (2004). In addition, that possession must be actual, open, notorious, continuous, hostile, exclusive and accompanied by an intent to hold against the true owner. *Id.* If the original use and possession of the land is permissive, it cannot become adverse until notice of the hostility of the possessor's holding has been brought home to the owner by actual notice or by a holding so open and notorious as to raise a presumption of notice equivalent to actual notice; the evidence of an adverse holding when the original entry is by permission must be very clear. *Rickett v. O'Dell*, 86 Ark.App. 86, 91, 160 S.W.3d 717, 720 (2004).

■ Appellant argues that appellee failed to meet his burden of proof for adverse possession. We agree. There was no fence between the parties' proper-

ty. And because the line farmed up to varied slightly from year to year, appellee did not have actual possession of all parts of the disputed property exclusively or continuously for the statutory period. Therefore, the trial court erred by finding the disputed land to be appellee's under the theory of adverse possession. However, this does not result in an automatic reversal of the trial court's order. We may affirm where a trial court reaches the right result for the wrong reason. *See Middleton v. Lockhart,* 355 Ark. 434, 139 S.W.3d 500 (2003).

■■■■■ Our inquiry now turns to whether or not the trial court reached the right result. We believe that it did. Boundaries are frequently found to exist at locations other than those shown by an accurate survey of the premises in question and may be affected by the concepts of acquiescence and adverse possession. *McWilliams v. Schmidt,* 76 Ark.App. 173, 61 S.W.3d 898 (2001). Something may become the accepted boundary even though it is contrary to the surveyed line. *Id.* When adjoining landowners silently acquiesce for many years in the location of a boundary and thus apparently consent to that line, the result is a boundary by acquiescence. *See id.* It is not required that there be an express agreement to treat something as a dividing line; such an agreement may be inferred by the actions of the parties. *Id.* Acquiescence need not occur over a specific length of time, although it must be for a long period of time. *Id.* A boundary line may be established by acquiescence whether or not it has been preceded by a dispute or uncertainty as to the boundary line. *Id.* Whether a boundary line by acquiescence exists is to be determined upon the evidence in each individual case. *Id.*

In the present case, appellee has acted as though the disputed property was his own for over forty years. When appellant attempted to change the line, appellee's renter notified him immediately. Appellant's witness stated that the land was farmed up to the low spot in the field. According to the witness, it was only after the survey revealed that the low spot was located on appellant's property that the line changed. The clear evidence shows that the ditch or low spot was the agreed upon boundary line between the parties' property. The farming of the property up to the low spot by each property owner for over four decades is sufficient to establish the existence of a boundary line by acquiescence of the disputed property. We affirm because the trial court reached the right result even though it articulated the wrong reason. *See Middleton, supra.*

Appellant also contends that the findings of fact by the trial court are not supported by the evidence. We will not reverse a trial court's findings of fact unless they are clearly erroneous. *McWhorter, supra.* Based on the evidence, we cannot say that those findings are clearly erroneous.

Affirmed.

VAUGHT, C.J., and KINARD, J., agree.