Cite as 2021 Ark. App. 105

# ARKANSAS COURT OF APPEALS
DIVISION IV
No. CV-19-263

| | | |
|---|---|---|
| ALAN BURLEY | | **Opinion Delivered:** March 3, 2021 |
| | APPELLANT | |
| V. | | APPEAL FROM THE UNION COUNTY CIRCUIT COURT [NO. 70CV-12-297] |
| JOE BRADLEY, JR.; ALICIA BRADLEY; AND MIKE LOFTIN, UNION COUNTY JUDGE | | |
| | APPELLEES | HONORABLE DAVID F. GUTHRIE, JUDGE |
| | | AFFIRMED IN PART; REVERSED AND REMANDED IN PART |

## MIKE MURPHY, Judge

This appeal arises from two declaratory judgments regarding a road in Union County, Arkansas, known as Possum Ridge Road. The appellant is Alan Burley (Burley), and the appellees are Joe Bradley, Jr., and Alicia Bradley (collectively "Bradley"); and Mike Loftin,[1] Union County judge. By agreement of the parties, the circuit court bifurcated the issues and held two separate trials. The first trial was limited to Burley's request for declaratory judgment on the status of Possum Ridge Road, and the circuit court held that it is a private road. The second trial addressed the remaining issues. The circuit court held that the gate in controversy and the speed bumps on the road could remain, and Bradley

---

[1]The appellant does not argue against summary judgment in favor of Mr. Loftin on appeal; therefore, we consider any claim against Mr. Loftin abandoned.

should be the one to maintain said road. Burley filed a timely notice of appeal on October 16, 2018.

## I. *Background Facts*

Bradley purchased real estate in 1997 and 2003 accessed by Possum Ridge Road (the "Road") with the stated purpose of establishing a private recreational facility on the Ouachita River. In 2002, Burley purchased property accessed by the Road, but he did not move into a residence on the property until 2007. Bradley approached Burley in 2003 about constructing a gate across the Road to deter trespassers and property theft. Burley consented to the gate, and both Bradley and Burley met with the county judge to discuss its placement. Bobby Edmonds, the county judge at the time, advised Burley and Bradley that all landowners who owned property served by the Road must consent to the gate. Consent was obtained, and the gate was put up at the start of the Road where it intersects Union County Road 302. When the gate was first put up it was secured with a chain and lock; however, it is now an electronic gate with remote access and a control pad for entry.

In 2007, Burley moved into his residence that is accessed by the Road. Since the placement of the gate, the relationship between Burley and Bradley had significantly deteriorated. On September 22, 2012, Burley hosted a church event and requested that Bradley leave the gate open so his guests could come and go. Burley contends one of his guests was detained at the gate by Bradley. Subsequently, Burley withdrew his consent to the gate and asked that it be removed. Burley contacted county judge Mike Loftin as well as the county sheriff, Mike McGough, regarding removal of the gate and met with both

individuals. Ultimately, the county sheriff advised Burley it was the county's position that the county road ended at the gate.

On November 6, 2012, Bradley sued Burley by filing a petition for judgment and injunctive relief. Bradley requested an emergency injunction directing Burley to close the gate each time he passes over the Road and, furthermore, a decree of specific performance requiring Burley to comply with the long-standing agreement of the parties regarding the gate. In response, Burley filed a third-party complaint[2] against Union County judge, Mike Loftin, individually and in his official capacity, alleging violations of his civil rights and a counterclaim against appellee seeking a judgment declaring the Road a county road.

The circuit court bifurcated the issues and held two trials. The status of the Road was tried first. On February 25, 2016, the circuit court entered an amended judgment declaring the Road to be a private road, not a county or public road, and therefore subject to reasonable security measures in a manner that would not unduly burden either landowner yet close the Road to the public. All remaining issues were tried in the second trial held on May 21, 2018, and the circuit court found the following: (1) the gate was a reasonable security measure and could remain; (2) the speed bumps could remain, with certain restrictions; and (3) Bradley was responsible for repairing and maintaining the Road. This appeal followed.

On appeal, Burley argues that (1) the circuit court's finding that the Road is a private road was clearly erroneous; (2) a public road cannot be converted to a private road through

_____

[2]The third-party complaint also added other adjacent landowners who were later nonsuited.

adverse possession; and (3) the circuit court's finding about the use and repair of the Road was clearly erroneous.

## II. *Standard of Review*

Appellate courts review appeals from bench trials, including declaratory judgments, under the clearly erroneous standard. *Poff v. Peedin*, 2010 Ark. 136, at 6, 366 S.W.3d 347, 350. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. *MacKool v. State*, 2012 Ark. 287, 423 S.W.3d 28. This court gives great deference to a circuit court's findings of fact; mindful that the circuit court is in the best position to hear testimony and determine the credibility of the witnesses. *Save Energy Reap Taxes v. Shaw*, 374 Ark. 428, 435, 288 S.W.3d 601, 604 (2008).

## III. *Discussion*

### A. Status of Road

For his first point on appeal, Burley argues the circuit court's finding that the Road is a private road is clearly erroneous. Specifically, appellant argues that (1) the finding was contrary to the weight of the evidence adduced at trial showing the Road is a public or county road; (2) it was error to apply judicial estoppel based on the then pending case of *Rolfe v. Burley*; and (3) the finding that the Road is for the use and benefit of only two landowners is clearly erroneous.

There was a significant amount of testimony and evidence presented at trial that detailed the existence of the Road dating back to the 1800s, and its use by the public to reach the Ouachita River. Regarding early use of the Road, the circuit court stated:

4

River transportation was prevalent in those days and the port of Wilmington Landing was established on the property to accommodate that trade. The Road was the means of access between Wilmington Landing and the interior of Union County. Without question, the Road was open to and used by the public during that time. When the river commerce died out, the landing area was used for hunting and weekend camps.

Testimony further established the Road had been used to access the river up until the gate was erected. Appellant contends, however, that the Road is a county road because (1) it was maintained and graded by county employees; (2) county records list the Road as "maintained" as opposed to "private"; and (3) the county never instituted the statutory proceedings required by law to abandon the Road.

As distinguished from public roads by prescriptive right, a county road may be created in one of three ways: (1) a voluntary dedication by the landowner and acceptance by the county; (2) county condemnation; or (3) the county judge may enter an order declaring a mail route or a school-bus route a county road. *Ark. Game & Fish Comm'n v. Lindsey*, 292 Ark. 314, 321, 730 S.W.2d 474, 478 (1987). The county clerk testified there were no records establishing the Road as a county road by either of these three statutory methods; therefore, the circuit court held that it was necessary to examine the use of the road and its maintenance.

At trial, Burley relied heavily on an unofficial county document that classified the Road as "maintained" as opposed to "private." The document was created in 1997 by Robin Osgood (Osgood) wherein each road in Union County was designated as either private or county maintained. Osgood was hired to assist then Union County judge Mike Dumas in implementing the 911 system. Part of implementing the 911 system was assigning a name to every road, and it was Osgood's job to do so. The document identifies the Road

as maintained. Osgood testified that she relied entirely on road supervisor, Charles Robinson, to tell her whether a road was maintained or not. She also testified she could have made a mistake when she indicated that the Road was county maintained.

Judge Mike Dumas testified he recalled Osgood's admitting to him that she may have made a mistake in listing the Road as maintained. An attempt to use internal county records to support a creation of a county road has been expressly rejected by our supreme court. In *Lindsey*, the court held nonjudicial action by someone without statutory or common-law authority is not sufficient to transfer title to the county. 292 Ark. at 321, 730 S.W.2d at 478. Likewise, we find that Osgood's internal records are not sufficient to vest title in the Road to Union County.

Appellant also relied on records indicating the county has maintained the Road both before and after the gate was erected in 2003. There are documents in the record that reflect the county has graded and provided some maintenance to the Road in the past. Records indicate that county personnel delivered gravel to the Road as recently as 2013. Additionally, county-road grader-work records reflect that grading was done on the Road five times in 2010, four times in 2011, and five times in 2012. Appellant also points to the county's placement of signs—such as "Union 303" and "No Littering"—on the Road.

The circuit court held the county maintenance performed on the Road was not done with enough "sufficient regularity" to make it a county road. Arkansas caselaw supports this finding. The Arkansas Supreme Court held in *Craig v. O'Bryan*, "[T]he mere fact that the roadway was occasionally worked by the county would not, of course, make it a county road. 227 Ark. 681, 684, 301 S.W.2d 18, 20 (1957). Mike Loftin, the Union County judge

6

since January 2011, stated that prior to the dispute, the county was grading the Road as a courtesy, and he provides courtesy grades all over the county in an effort to keep the roads smooth and passable. Furthermore, Richard Ballard, who was a Union County road grader for twenty years, testified to the practice of providing courtesy grades with the permission of the county judge. Regarding the purchase of county gravel, Bobby Edmonds, Union County judge from 1997 through 2010, testified he allowed Bradley to purchase gravel from the county, and any taxpayer could do so in an effort to better maintain private roads. Edmonds also testified to an agreement he made with Bradley in which the county would grade past the gate in exchange for the limited purpose of being allowed to use Bradley's property for emergency-response purposes. The county needed access to the property in the event first responders needed to access the Ouachita River. The evidence supports that county maintenance was done as a "courtesy" to Bradley.

The circuit court found the testimony of the current and former Union County judges to be the most credible and to carry the greatest weight, particularly the testimony of Judge Loftin, who was the road supervisor for eight years before his election as county judge. First, Mike Dumas (Dumas), who served as the Union County judge from 1981 through 1990, testified that one of his main functions was to manage and operate the county-road department. Dumas testified that, during his entire tenure as judge, the Road was not a county road, and Union County did not maintain it as such. Second, Edmonds, who served as county judge from 1997 to 2010 testified that the Road was never county maintained during his tenure as judge. Lastly, Judge Loftin, the current Union County judge

and former county-road foreman, testified he is familiar with the Road, and it is not a county road and never has been.

It cannot be said that the circuit court clearly erred in affording great weight to the testimony of county officials who have collectively held the position of Union County judge from 1991 to the present and whose function as judge largely involves the management and operation of the county-road department. This court gives great deference to the circuit court's finding of fact, given that the circuit court is in the best position to hear the testimony and determine the credibility of witnesses. *See Save Energy Reap Taxes*, 374 Ark. at 435, 288 S.W.3d at 604. We therefore find no clear error in the circuit court's finding that the Road is not a county road.

On appeal, the appellant notes that both of the circuit court's orders acknowledge the Road was, at one time, a public road. A "public road"—as distinguished from a "county road"—may be established by judgment of the county court, by voluntary dedication, or by prescription. *Weir v. Revo Trucks*, 255 Ark. 494, 500 S.W.2d 923 (1973). Here, the circuit court found from the evidence that for a period of time the Road was a public road by prescription, but whatever right by prescription the public had garnered over the years was abandoned and lost by the locked gate. A prescriptive right-of-way in a public road can be established by the public or the county using the road for a period of seven years. *Neyland v. Hunter*, 282 Ark. 323, 668 S.W.2d 530 (1984). Because the circuit court held that the locked gate terminated whatever rights the public may have had in the Road, it is unnecessary to discuss whether the public acquired a prescriptive right-of-way.

B. Adverse Possession

For his second point on appeal, Burley argues the circuit court's ruling that the public nature of the Road was terminated by the nine-year locked gate is directly contrary to Arkansas law. To support his argument, appellant cites Arkansas Code Annotated section 22-1-201, which prevents acquisition of title to a public throughfare through adverse occupancy. Furthermore, he cites our supreme court's opinion in *Neyland*, which states that the purpose of the statute is to protect rural roads from hostile claims of adverse possessors. 282 Ark. 323, 668 S.W.2d 530. In response, Bradley contends Arkansas law has long recognized that the public's right to a road can be extinguished by a period of more than seven years of nonuse.

Our supreme court construed section 22-1-201 in a case with strikingly similar facts as are present here. In *Raney v. Gunn*, 221 Ark. 10, 11–12, 252 S.W.2d 559, 560 (1952), the court held as follows:

> [W]e are not able to say it was the intention of the General Assembly to prevent title to an abandoned thoroughfare, created by prescription, from reverting to the owner of the fee after lapse of the statutory period.
>
> The public's use of this road was based on its passage over the property, not by dedication through a governmental or quasi-governmental agency. When the landowner restricted such use by erecting gates in 1928 and maintaining them subsequently, members of the general public ceased to use the road. This constituted an abandonment. Appellees' rights were not dependent upon affirmatively establishing adverse possession. Instead, appellants had the burden of proving that a prescriptive right to use the road still existed, and they failed.
>
> Appellants urge that presence of the gates was not evidence of public abandonment, but was rather an invitation to the public to use the road with an implied understanding that the gates would be closed.

> After the gates were erected public use of the road became permissive. Prescription ceased and no move was made to preserve it. Acquiescence became abandonment and the public right expired.

It is long-standing Arkansas law that when a gate is maintained for more than seven years across a road in which the public has a prescriptive easement, it is deemed that the public has abandoned the road, and the landowner has the right to close it permanently and restrict the road to permissive use. *Munn v. Rateliff*, 247 Ark. 609, 613, 446 S.W.2d 664, 667 (1969); *see also Brooks v. Reedy*, 241 Ark. 271, 407 S.W.2d 378 (1966).

Appellant's attempt to distinguish the facts here by arguing that the Road cannot be taken by adverse possession because the installation of the gate was permissive and not hostile is without merit. The fact that the parties consulted with the county judge about installing the gate does not negate long-standing precedent that the placement of the gate and the passing of more than seven years constituted an abandonment of any prescriptive easement previously acquired by the public. *See Brooks*, 241 Ark. 271, 407 S.W.2d 378 (holding it is not unusual for one to take all steps possible to strengthen his or her position, even to the extent of taking unnecessary or superfluous action). Furthermore, the evidence supports the circuit court's finding that the public's use of the Road, other than permissive use, ceased after the gate was erected. Appellant maintains that the circuit court's finding that the Road's use was for the benefit of only two landowners requires reversal because the evidence supports extensive public use of the Road. We do not agree. The testimony demonstrates that once the gate went up in 2003, the Road was used only by Bradley, Burley, and their invitees, as well Bradley's in-laws, who live in a trailer on Bradley's property.

10

The evidence, as well as long-standing Arkansas precedent, supports the circuit court's finding that the Road is now a private road; therefore, it is not clearly erroneous and will not be overturned on appeal. For this reason, it is unnecessary to discuss appellant's argument against the circuit court's application of judicial estoppel.

## C. Use and Repair of the Road

For his third point on appeal, appellant maintains that the circuit court's findings in the second trial regarding the use and repair of the Road are clearly erroneous and require reversal. Specifically, he contends that (1) the gate cannot remain where the dominant estate does not agree to its presence; (2) as the dominant estate holder, he has the right to refuse speed bumps on the easement; and (3) it was error for the circuit court to grant the responsibility of repairing and maintaining the Road to the servient estate holder. In response, appellees argue that the gate and speed bumps do not unreasonably interfere with Burley's use of the Road, and he should be allowed to maintain the Road as he has done at his own expense since the installment of the gate.

The circuit court held that as a private road, the Road is subject to reasonable security measures in a manner that will not unduly burden either landowner or close the road to the public. The gate in controversy was installed in 2003. The testimony revealed the purpose of the gate is to block access to the area by trespassers, thieves, and vandals who had caused damage to buildings and loss of equipment stored there. Bradley testified regarding a significant amount of personal property he keeps at a game room and boathouse on the property including, but not limited to, hunting feeders, tractors, bulldozers, fishing equipment, bush hogs, four-wheelers, vehicles, and boat loaders. Bradley testified that

before the gate was installed, he had issues with trespassing and had items like boat loaders and weed eaters stolen. At trial, appellant acknowledged that the gate also benefited his property because it keeps trespassers and thieves off his property. Appellant further admitted he cannot see Bradley's game room from his property and therefore would not be able to see someone stealing from the property.

The circuit court found that Burley's revocation of consent to the gate did not mandate the gate must come down. Specifically, the circuit court held:

> The need for security therefore still exists even in the absence of an agreement. Bradley, as an owner of substantial property, has an inherent right to protect his property. However, this right to protect must be balanced with Burley's right of access across Bradley's property by an established easement. That easement does not give Burley a veto option over common security measures. The gate may be an inconvenience at times to guests and invitees of Burley, but it is not unduly burdensome to the use of Burley's easement and inures to his benefit.

Both parties cite *Jordan v. Guinn*, 253 Ark. 315, 485 S.W.2d 715 (1972), in support of their respective arguments. In *Jordan*, an easement holder filed suit demanding that a gate erected by the owners of the servient estate be removed. The supreme court held that the gate had to come down because it completely obstructed the easement holder's ingress and egress to his property therefore constituting an unreasonable obstruction. 253 Ark. at 323–24, 486 S.W.2d at 721. The court in *Jordan* expressly noted that the gate was not erected for any purpose other than to prevent the easement holder's ingress and egress.

An appurtenant easement runs with the land and serves a parcel of land known as the dominant tenement, while the parcel of land on which the easement is imposed is known as the servient tenement. *Winningham v. Harris*, 64 Ark. App. 239, 981 S.W.2d 540 (1998). As a general rule, the owner of the servient estate may erect gates across the way if they are

12

so located, constructed, or maintained as not to unreasonably interfere with the right of passage and when they are necessary for the preservation and proper and efficient use of the lands constituting the servient estate. *Jordan*, 253 Ark. at 321, 486 S.W.2d at 720–21. Whether the servient owner has a right to place gates across an easement is generally a question of fact that is dependent upon the facts and circumstances of the particular case. *Id.* at 321–22, 486 S.W.2d at 720.

Here, the appellant's reliance on *Jordan* is misplaced as the evidence does not support the same finding. First, there was testimony from both parties regarding the reason the gate went up: to safeguard the property from trespassers, vandals, and thieves. There was also evidence that before the placement of the gate, Bradley was the victim of theft on his property. These facts distinguish the present case from *Jordan*. As stated above, the circuit court was in the best position to make determinations of fact, and its findings will not be disturbed absent clear error, which is not present here. Therefore, the circuit court's denial of appellant's request for a mandatory injunction requiring the removal of the gate is affirmed.

Burley also requested a mandatory injunction requiring the removal of certain speed bumps that Bradley's in-laws put up close to their trailer. At trial, Wallace Ford, Bradley's father-in-law, testified he lives in a trailer near Burley's property and, due to Burley's occasional speeding down the Road, he put up speed bumps to ensure the safety of his grandchildren who regularly play at his residence. Ford testified that his trailer is a mere eight feet from the Road and more than fifty feet from Burley's property line. Much of the testimony at trial was regarding whether the speed bumps were too high. Ford testified he

13

mistakenly made the speed bumps too high initially, but he graded them down immediately after Bradley pointed out his mistake.

The circuit court held that the speed bumps would be allowed but were restricted to an area within 150 yards from each end of Ford's trailer, warning signs must be posted, and the bumps must be of a reasonable height and width. When determining the relations between an easement owner and a possessor of the servient estate, the same analysis applied to the gate applies to the speed-bumps issue. Bradley must not erect any barrier that unreasonably interferes with the right of passage of Burley. The circuit court found that the use of speed bumps, with the specific restrictions listed, is a reasonable safety measure given the testimony and evidence before the court. We find no clear error in the court's finding; therefore, the ruling as to the speed bumps is affirmed.

Lastly, appellant argues the circuit court's ruling that Bradley shall be the one to repair and maintain the Road places an unreasonable burden and restriction on his easement and is contrary to Arkansas law. The circuit court held as follows:

> As the owner of the servient estate on which the road is located, Bradley shall be responsible for the repair and maintenance of the road and shall perform such work in a timely manner when needed. Costs of such repair and maintenance shall be shared equally by the parties as Burley, a full time resident, will use the road more frequently than Bradley. Burley shall not perform any repair or maintenance on the road without the express consent of Bradley. Burley's use of the road shall be consistent with residential and periodic commercial delivery use.

Burley cites this court's opinion in *Wilson v. Johnston*, 66 Ark. App. 193, 990 S.W.2d 554 (1999), in support of his argument. In *Wilson*, the owner of the dominant tenement filed a complaint for declaratory judgment and injunction to have her rights with regard to a private way determined. Ultimately, the circuit court rejected Wilson's request to pave a

14

small strip of land in the private way and also held it was the responsibility of the servient estate to repair and maintain the easement. On appeal, this court reversed the circuit court's finding regarding the servient estate's responsibility to repair and maintain the easement. The court held that the owner of a dominant estate is responsible for preparation, maintenance, improvements, and repair of the way "in a manner and to an extent reasonably calculated to promote the purposes for which it was created . . . causing neither an undue burden upon the servient estate nor an unwarranted interference with the rights of common owners . . . ." *Id.* at 193, 990 S.W.2d at 557 (citing *Barraclough v. Ark. Power & Light Co.*, 268 Ark. 1026, 1030, 597 S.W.2d 861, 863 (Ark. App. 1980).

In *Barraclough, supra,* we also explained that the general rule—which provides that once the character of an easement is fixed, no material alterations can be made in the physical conditions that are essential to the proper enjoyment of the easement except by agreement— is a restriction on the owner of the servient estate rather than on the owner of the dominant estate. In conclusion, we held Wilson could do "whatever is necessary to preserve the easement, including reasonable repairs and improvements." *Wilson*, 66 Ark. App. at 199, 990 S.W.2d at 557.

In response, appellees contend that, regardless of who may legally be responsible if both parties refuse to maintain the Road, other courts recognize that the owners of an easement have the shared duty to repair and maintain the easement. While Bradley cites caselaw from other states that supports such theory, it is not persuasive because there is controlling Arkansas precedent directly on point. Thus, we hold that the circuit court clearly erred by ordering Burley not to perform any repairs or maintenance on the Road

15

without the express consent of Bradley. This finding is in direct conflict with our holding in *Wilson*; therefore, reversal on this issue is required. We reverse and remand to the circuit court.

IV. *Conclusion*

Having considered the evidence and being mindful of our standard of review, we find no clear error in the circuit court's ruling that the Road is a private road, and any rights the public acquired through prescription were abandoned and lost by the gate that has been maintained for more than seven years. The circuit court's February 25, 2016 order is affirmed. Additionally, the circuit court's order regarding the gate and speed bumps is affirmed. However, the circuit court's ruling regarding the repair and maintenance of the Road is clearly erroneous; therefore, we reverse and remand.

Affirmed in part; reversed and remanded in part.

HARRISON, C.J., and WHITEAKER, J., agree.

*Cullen & Co., PLLC*, by: *Tim Cullen*, for appellant.

*PPGMR Law, PLLC*, by: *Kimberly D. Logue* and *Brian Ratcliff*, for separate appellees Joe Bradley, Jr., and Alicia Bradley.