Cite as 2024 Ark. App. 10

# ARKANSAS COURT OF APPEALS

DIVISION I
No. CV-23-39

| | |
|---|---|
| RATS ENTERTAINMENT PARK, LLC<br>APPELLANT | Opinion Delivered January 10, 2024 |
| V. | APPEAL FROM THE CALHOUN COUNTY CIRCUIT COURT<br>[NO. 07CV-22-5] |
| ROGERS LAND & TIMBER, LLC; AND JOE M. ROGERS, SR.<br>APPELLEES | HONORABLE SPENCER G. SINGLETON, JUDGE<br><br>AFFIRMED |

**KENNETH S. HIXSON, Judge**

Appellant RATS Entertainment Park, LLC (RATS Entertainment), appeals from the Calhoun County Circuit Court's judgment in favor of Rogers Land & Timber, LLC (Rogers Land), and Joe M. Rogers, Sr. (Mr. Rogers) (collectively, Rogers). On appeal, RATS Entertainment contends that (1) the circuit court erred in failing to find that the public had a prescriptive easement as to the disputed road in question; and (2) the circuit court erred in failing to find that RATS Entertainment had an easement across the disputed road in question. We affirm.

I. *History of the Parties*

The property in dispute is a roughly rectangular piece of unenclosed and open property. Since 2004, Star Timber, LLC (Star Timber), has owned property on the west side,

and Mr. Rogers[1] has owned property on the east side. At the common boundary line at the location in dispute, the Star Timber property and Mr. Rogers's property are separated by a creek bed generally referred to as "Two Bayou Creek."[2] There is also an old logging road that apparently follows this dry creek bed. It is undisputed that Two Bayou Creek and the logging road are located on Mr. Rogers's property.

Star Timber purchased an 1,803-acre tract of land in Ouachita County from Blue Sky Timber Properties, LLC (Blue Sky), in June 2004. Jerry C. Langley is the managing member of Star Timber. The Star Timber property is generally described as the "north end" (the low end) and the "south end" (the high end). There is a gap between the north-end tract and the south-end tract. The most direct route to access the north-end tract from the south-end tract, and vice versa, entailed crossing Mr. Rogers's property: proceeding north, Star Timber would exit its south-end property and cross over the Ouachita/Calhoun County line, follow the creek bed (Two Bayou Creek) and the old logging road on Mr. Rogers's property, and then reenter Star Timber's north-end property. In July 2021, SAL Timber, LLC, another LLC managed by Jerry Langley, purchased an 80-acre tract from Hogan Timber, LLC, that joined the north-end tract and the south-end tract, which gave Jerry Langley's combined

---

[1]Although it is clear from our record that Mr. Rogers owns the property on the east side according to both the special warranty deed and his testimony, it is unclear whether Rogers Land leases or simply operates on the land.

[2]Two Bayou Creek also separates Ouachita County from Calhoun County at this point.

LLCs continuous access to the entire 1883-acre tract without crossing over onto Mr. Rogers's property.

Mr. Rogers owns over 900 acres of real property in Calhoun County, that generally lies to the east of the Star Timber property. The special warranty deed recorded on April 5, 2004, reflects that SP Forests, LLC, conveyed the property, including "all roads," to Mr. Rogers. A portion of Mr. Rogers's property abuts the Star Timber property. At this abutting location, Mr. Rogers's Calhoun County property is separated from Star Timber's Ouachita County property by Two Bayou Creek.

This case stems from a dispute over the use of an old logging road that has existed for decades that begins off of Highway 79 in Ouachita County on Star Timber's property and meanders generally north/northeast and crosses Two Bayou Creek into Calhoun County and onto Mr. Rogers's property. The road then continues north/northeast and meanders back onto Star Timber's property and finally intersects with County Road 205. As stated above, before July 2021, Star Timber's south-end and north-end tracts were separated. The most direct route for Star Timber to access its north-end tract from the south-end tract, was to cross over Two Bayou Creek onto Mr. Rogers's property, travel several hundred feet along an old logging road, and then reenter its own north-end tract. The dispute in this case concerns the portion of the road that Star Timber was accessing that is located on Mr. Rogers's property and is referred to herein as the "disputed road." The evidence in the record generally reveals that from 2004 through approximately 2020–21, there had been no disputes nor even much, if any, communication between Jerry Langley and Joe Rogers. The

3

combined properties were open and unenclosed and had been used occasionally for hunting and logging. There were no structures on either property. This all changed in 2020–21.

Jerry Langley was part of a group that decided to create an all-terrain vehicle recreation park on his 1,883-acre tract. RATS Entertainment is an Arkansas limited liability company that built and operates an all-terrain vehicle (ATV) recreation park. Mr. Langley is the managing member of RATS Entertainment. Star Timber leased its 1,803 acres to Fun City, LLC, for an annual rent payment of $500. Fun City, in turn, subleased the 1,803 acres to RATS Entertainment.

The plat for RATS Entertainment reveals a combination of campsites, RV dump sites, concession stands, parking lots, and a tangled web of ATV trails that traverse the entire 1,883-acre tract. The main access for RATS Entertainment is off of Highway 79 at the southern end of Star Timber's property. There is another smaller access off County Road 205 at the northern end. One of RATS Entertainment's trails crosses over onto Mr. Rogers's property and follows Two Bayou Creek and the old logging road and then reenters Star Timber's property (the disputed road.) After ATV riders had begun using the disputed road, Mr. Rogers erected gates with locks at the two end points of the disputed road on his property, preventing RATS Entertainment and its ATV riders from accessing the disputed road when locked. This act prompted RATS Entertainment to file suit against Rogers.

## II. *Litigation*

RATS Entertainment filed a complaint on February 23, 2022, and an amended complaint on February 25, 2022, against Rogers. In its amended complaint, RATS

4

Entertainment sought a preliminary and permanent injunction to enjoin Rogers from closing the two gates at either end of the disputed road that connects RATS Entertainment's (Star Timber's) south-end tract to its north-end tract. RATS Entertainment further requested that the disputed road be declared a public easement or, alternatively, that RATS Entertainment and its lessors be granted a prescriptive easement or an easement by necessity. RATS Entertainment also alleged in its amended complaint that it was having a soft grand opening on February 26, 2022, and that Rogers's locked gates on the disputed road would create irreparable harm.

The circuit court granted an emergency ex parte temporary restraining order prohibiting Rogers from locking the gates and blocking access to the disputed road for the soft grand opening. Rogers filed their answer to the amended complaint on March 14, 2022, wherein they denied the allegations and asked that the amended complaint be denied and dismissed.

A subsequent hearing for a preliminary injunction was held on March 31, 2022. RATS Entertainment argued that irreparable harm would result since its grand-opening event was scheduled in May 2022 and that a lack of full access to the disputed road would prevent it from putting forth its best presentation for customers. It explained that the financial impact could stretch for many years.

At the hearing, Jerry C. Langley testified that he is one of the owners of RATS Entertainment. He explained that RATS Entertainment had been in operation for approximately two years and leases the property next to the Rogers's property. He further

5

explained that Star Timber owns the property and that he is Star Timber's managing member. He confirmed that Star Timber leases the property to Fun City, and RATS Entertainment subleases the property from Fun City. Mr. Langley explained that he is either the manager or the managing member of Fun City as well.

A map that was provided by RATS Entertainment to its customers was admitted into evidence. Mr. Langley testified that he had also obtained a map from Calhoun County that marked the disputed road as 406 and 407. That map was also admitted into evidence. Mr. Langley testified that since Star Timber acquired the property in 2004, he had personally used the disputed road on Rogers's property. He said that the disputed road was used to haul "2200 loads plus of gravel" onto his property to build the ATV park and as an "emergency exit" for access to County Road 205 to the north. Mr. Langley offered invoices from 2015 and 2017 for equipment and gravel that was purchased to build the park. Mr. Langley testified that in addition to his use of the disputed road, he had seen other patrons and an "AT&T van" using the disputed road. He also claimed that he had put some gravel on the disputed road to maintain it.

Mr. Langley testified that he did not know Rogers had any problem with his use of the disputed road until he received a call from Joe Rogers in February 2022. He stated that Mr. Rogers told him that he did not want any of the campsites that RATS Entertainment had built next to his property. Mr. Langley claimed that after Mr. Rogers had raised his voice, he "just laid the phone down." Mr. Langley stated that this lawsuit was filed because

he was concerned that Rogers would lock the gates that were at both ends of the disputed road on Rogers's property and impede the grand opening of the ATV park.

On cross-examination, Mr. Langley acknowledged that the map admitted into evidence did not mark the disputed road as 407 and that the map marked the disputed road only as 406.[3] He also acknowledged that the invoices admitted into evidence for gravel and a grader were from within the last seven years. Mr. Langley admitted that much of RATS Entertainment's land and Rogers's land was unenclosed. However, after RATS Entertainment built the ATV park, RATS Entertainment's land now has several trails and campsites for ATV riders. He explained that the park had 928 people attend the event the weekend before the hearing. Mr. Langley testified that Rogers had allowed loggers and hunters to use the disputed road in the past and only erected the gates in the last few months after the ATV riders had begun using the disputed road. He also testified that the portion of the road that was on RATS Entertainment's property was maintained by him, except that "the Ouachita County boys have graded it a few times" over the past twenty years. Langley denied that the ATV riders had damaged the disputed road, but he did acknowledge that there was more traffic on the disputed road in recent years. Finally, Mr. Langley admitted that there had been a gate on RATS Entertainment's property but claimed that it was never

---

[3]The references to the "disputed road" as Calhoun County Road 406 or 407 is unclear. Perhaps, the lack of clarity arises from the fact that Two Bayou Creek and the disputed road may be shown inconsistently on both the Calhoun County map and the Ouachita County map since it separated the two counties. However, the lack of clarity is not relevant to the disposition of this appeal.

7

locked. Despite his testimony that the gate was never locked, Mr. Langley stated that he "cut down the gate" because he could not "keep up with the keys."

Calhoun County Judge Floyd W. Nutt (the disputed road lies within Calhoun County) testified that he is familiar with the section of the disputed road. He explained that the Calhoun County map designates a number for the road for "911 purposes to identify the road in case of an emergency." Judge Nutt explained that the disputed road is not a "county road" but opined that he would consider it a "public road" because it had "been open to the public for years."

On cross-examination, Judge Nutt testified that he was aware of a gate on the disputed road that Mr. Rogers had kept locked. When asked whether the county had ever maintained the disputed road, Judge Nutt said that he thought the county had maintained the disputed road only once or maybe twice in twenty years. He confirmed that the road had never been dedicated as a "County Road."

Joshua Barkhimer testified that he was employed by Neely Forestry Services. Barkhimer explained that he had been part of the hunting club that was previously on RATS Entertainment's property. He further explained that hunters and timber companies had used the disputed road over the course of forty years. Mr. Barkhimer testified that he had used the disputed road during his employment with Neely Forestry Services to log the property for Star Timber. He acknowledged that he did not ask for consent or permission to use the disputed road at that time.

On cross-examination, Mr. Barkhimer testified that there were a few gates erected in the 1980s on RATS Entertainment's portion of the road that would commonly be locked, "especially during hunting seasons." He explained that those gates would be locked even after Star Timber had acquired the property. Although Mr. Barkhimer testified that he had seen vehicles traverse the disputed road over the years, he did not recall any time in which over 800 ATVs had traversed the road in either a one- or two-day period.

Joe Rogers testified that he is the general manager for Rogers Land. Mr. Rogers testified that he had acquired title to his property, including the disputed property, in 2004 and that the special warranty deed specifically conveyed to him "all roads, bridges and other infrastructure improvements thereon." Mr. Rogers testified that he had been maintaining the disputed road by placing gravel on it. Mr. Rogers testified that he was not aware that Mr. Langley had ever put any gravel on the disputed road. He also testified that he did not have any knowledge of the county ever maintaining the disputed road. Mr. Rogers acknowledged that there had been gates on RATS Entertainment's property that had historically been locked and that Mr. Langley had started grading the disputed road only within the last year. Mr. Rogers explained that the historical use of the disputed road had been limited to loggers and hunters who had been issued leases in which he gave his permission to use the disputed road. He further explained that he had erected gates to prevent the ATV riders from accessing his property after he had discovered them using the disputed road and after an oral confrontation with Mr. Langley about it. He expressed his concerns over the damage the ATV riders were causing to the disputed road and his property

9

and whether he could be held liable if any of the ATV riders were to get into a wreck on the disputed road.

Ken Griffin testified that he was employed by Rogers Land as a forester. Mr. Griffin explained that he was familiar with the gates that had been on RATS Entertainment's property and testified that he had always known them to be locked. He further explained that Mr. Langley had recently removed those gates approximately a month before the hearing. Mr. Griffin testified that he had only seen "our deer hunters" using the road. He explained that those hunters had leases to hunt on the property. Before recently, he had only known Mr. Rogers to maintain the disputed road. However, he explained that Mr. Langley had graded the disputed road a couple of times in the last few months. Mr. Griffin expressed his concerns over the recent damage caused to the disputed road after the ATV riders had started using it. He also stated that Mr. Langley had told him that another road was built on RATS Entertainment's property through the 80 acres (the Hogan property) that had been recently acquired so that the disputed road did not need to be used; however, Mr. Langley indicated that the disputed road was more convenient and allowed riders to make a "big ol' loop" instead of having to "turn around."

After hearing oral arguments at the conclusion of the hearing, the circuit court took the matter under advisement. The circuit court subsequently filed an order denying a preliminary injunction on April 1, 2022. In the order, the circuit court found that RATS Entertainment had failed to meet its burden of showing irreparable harm. It further found that although it would be more convenient for ATV riders to cross onto Rogers's property,

10

a "mere inconvenience" was not irreparable harm. The court explained that RATS Entertainment was able to provide its customers access to its entire property by using the Ouachita County 205 entrance. Moreover, the circuit court stated that it could award financial compensation for any loss of use in the event it subsequently granted the amended complaint.

A final trial was held on May 26, 2022. At the start of the trial, the parties agreed any testimony and evidence presented at the hearing on the preliminary injunction should be merged and considered by the circuit court.

Mr. Langley repeated much of his testimony as presented in the preliminary-injunction hearing. He further testified that RATS Entertainment was unable to hold its grand opening as planned because Rogers had "shut the road off" and "the mud was too deep" to go the "back way." Mr. Langley testified that he had obtained a Calhoun County map from the courthouse. He explained that according to the legend, the "[g]ravel local road, and the road numbers are 406 and 407 county road numbers."

On cross-examination, Rogers's counsel questioned Mr. Langley on how he reached the conclusion that the map indicated the disputed road was a gravel local road. Mr. Langley explained that it looked like a gravel road "[j]ust by the marks and the lines." Mr. Langley admitted that he had no invoices for any work he had done on the disputed road prior to 2015 because he did not "keep them that far back." Regarding the roads on RATS Entertainment's land, Mr. Langley testified that he thought they were also public roads and that he could not preclude the public from using them. However, he acknowledged that he

11

would put up temporary fencing during events, but he claimed that this fencing was to prevent people from "leaving our property and getting on other people's property" and not to prevent people from getting onto RATS Entertainment's property. Mr. Langley also admitted that the deed to the 1,803 acres that was acquired by Star Timber in 2004 and leased to RATS Entertainment included the following provision: "GRANTOR reserves from this conveyance the following . . . 3. All ingress and egress over and across the existing woods road as needed to complete timber management and research monitoring activities on the lands identified and shown on Exhibit C, attached hereto and made part hereof." Mr. Langley testified that he had no idea why the grantor reserved the right to travel on the road mentioned in the deed if the roads were public roads as he contended.

After RATS Entertainment rested, Rogers moved for a directed verdict. RATS Entertainment responded that it was withdrawing its claim that there was an easement by necessity. Instead, RATS Entertainment argued that the disputed road was "a public road," a "prescriptive easement for the benefit of the . . . public," or "an easement for Mr. Langley and those under him can utilize." The circuit court denied the motion for directed verdict.

Mr. Rogers also repeated much of his previous testimony. He reiterated that the gates on RATS Entertainment's property had historically been locked, and that is why he never had to put up his own gates until after RATS Entertainment stopped locking the gates, and the ATV riders began using the disputed road. Mr. Rogers explained that it was then that he erected the gates to prevent the riders from using the disputed road on his property.

12

Paul Simpson testified that he had previously been employed by International Paper, an entity that previously owned both RATS Entertainment's and Rogers's properties. Simpson explained that when he worked for the company in the mid-1980s, the same roads discussed at trial were either in existence or built by International Paper. He further acknowledged that the gates that were on RATS Entertainment's property were historically locked at that time. Mr. Simpson testified that the disputed road was historically used by only hunters and loggers. On cross-examination, Mr. Simpson admitted that he had no knowledge regarding the use of the property after 2001.

Although Ken Griffin briefly testified at the final trial, he did not add anything that he had not already testified about in the preliminary-injunction hearing.

After the parties rested, they orally argued their respective positions. RATS Entertainment repeated its contention that the disputed road was either a public road, a prescriptive easement for the benefit of the public, or at the "very minimum" an easement that RATS Entertainment may utilize. The circuit court took the matter under advisement and instructed the parties to prepare and submit proposed findings of fact and conclusions of law.

The circuit court filed its written order on September 29, 2022, and it made the following relevant findings:

> "A 'public road' - as distinguished from a 'county road' - may be established by judgment of the county court, by voluntary dedication, or by prescription." *Burley v. Bradley*, 2021 Ark. App. 105.

13

Judge Nutt testified the Disputed Road is not a county road. He further testified that the Disputed Road has not been established as a public road by the County Court and it has not been dedicated. Judge Nutt opined that he believed the Disputed Road to be open to the public, however his opinion does not overcome the other evidence that the road was infrequently traveled, that the previously existing gates were frequently locked, and that [Rogers has] prevented the public's access to the Disputed Road by locking its gates on the south side. Additionally, [Rogers has] not dedicated their road as a public road.

Thus, the only remaining avenue for the Disputed Road to be deemed a public road is through prescriptive easement.

. . . .

[Rogers] own[s] the Disputed Road. [Rogers's] Property is unenclosed and there is no order of the County Court making it a county road. The result is the presumption that use of the Disputed Road by others is not adverse to the rights of [Rogers], but by [Rogers's] consent. [Rogers has] allowed [RATS Entertainment] and hunters to use the Disputed Road with permission. [Rogers] did not cause gates to be erected on the Ouachita County/Calhoun County line until they learned of the intention of [RATS Entertainment] to allow ATV's to traverse the Disputed Road on [Rogers's] Property during events at the ATV Park, thereby revoking [Rogers's] consent. Prior to this, [Rogers] never had an issue with random loggers, gravel trucks, or hunters traversing the Disputed Road with [Rogers's] permission.

Mr. Rogers, Mr. Griffin, and Mr. Berkheimer [sic] testified that all gates that access the Disputed Road are locked and have been for years. Mr. Simpson testified that all gates that access the Disputed Road were locked from the mid-1980's until 2001. Mr. Langley is the only witness that testified that the gates located on [RATS Entertainment's] Property, in Ouachita County, had been unlocked and open since he took title to the same in 2004.

Even if the Court believes Mr. Langley's testimony that [RATS Entertainment] keeps its gates unlocked, this flies in the face of his other testimony that [RATS Entertainment] prevents access to [RATS Entertainment's] Property during events. The Disputed Road has not been a public road as claimed by [RATS Entertainment]. Interestingly, [RATS Entertainment] only wants the Disputed Road in Calhoun County to be a public road. [RATS Entertainment] has treated, and apparently will continue to close the roads in Ouachita County that are on [RATS Entertainment's] Property during ATV events and those roads are necessary to access the Disputed Road in Calhoun County. Thus, during ATV events the Disputed Road in Calhoun

County would not be publicly accessible due to [RATS Entertainment's] actions. [Rogers] allowing infrequent hunters to traverse the Disputed Road, and [RATS Entertainment] to utilize the Disputed Road for timber operations and hauling gravel, has been out of a sense of neighborliness or rural custom. Finding the Disputed Road is a public road for nearly a thousand vehicles to travel in a given weekend would certainly be an unintended consequence that [Rogers] could not foresee when previously accommodating [RATS Entertainment] and hunters for limited purposes.

Further, the Deeds to [RATS Entertainment's] lessor clearly indicated the need to reserve access to the existing roads. Why would the Grantor of [RATS Entertainment's] Property, a highly sophisticated entity, find it necessary to negotiate such a term in the Deed to [RATS Entertainment's] lessor if the roads on [RATS Entertainment's] Property were public roads? Likewise, the Deed to [Rogers] expressly addressed the existing roads on [Rogers's] property, transferring all roads to [Rogers].

In *Pop-A-Duck* [*v. Gardner*, 2022 Ark. App. 88, 642 S.W.3d 220], various witnesses presented testimony of repairing the road in question. Admittedly, the witnesses in the *Pop-A-Duck* case presented no written documentation to evidence the alleged work performed, but [RATS Entertainment] in this case only presented documentary evidence of work it has performed within the last seven (7) years. In addition, Mr. Langley's testimony was vague, as was the testimony in *Pop-A-Duck*, as to the type of work [Rogers] has allegedly performed on the Disputed Road. Mr. Rogers and Mr. Griffin both testified they were only aware of [RATS Entertainment] working on the Disputed Road within the last two (2) years.

[RATS Entertainment] also claims it is entitled to an "easement appurtenant." Defendants assert there is no cause of action for an "easement appurtenant." The term easement appurtenant applies to an easement that runs with the land, as distinguished from an easement in gross that is specific to a party and does not run with the land, i.e. ending with the life of the parties to the transaction. *Rose Lawn Cemetery Ass'n v. Scott*, 229 Ark. 639, 317 S.W.2d 265 (1958).

. . . .

IT IS THEREFORE CONSIDERED, ORDERED, AND ADJUDGED as follows:

1. [RATS Entertainment] request to enjoin [Rogers] from erecting and closing the gates on [Rogers's] property should be denied,

2. The Disputed Road should not be declared a public road,

15

> 3.  [RATS Entertainment] and [RATS Entertainment's] lessors should be denied an easement across the Disputed Road[.]

This appeal followed, and RATS Entertainment abandoned any pending but unresolved claims in its notice of appeal.

### III.  *Standard of Review*

This court reviews equity matters de novo on the record but will not reverse a finding of the lower court unless it is clearly erroneous.  *See Owners Ass'n of Foxcroft Woods, Inc. v. Foxglen Ass'n*, 346 Ark. 354, 57 S.W.3d 187 (2001).  A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been committed.  *Id.* at 361, 57 S.W.3d at 192.  In reviewing a circuit court's findings, we give due deference to that court's superior position to determine the credibility of the witnesses and the weight to be accorded to their testimony.  *Carson v. Cnty. of Drew*, 354 Ark. 621, 128 S.W.3d 423 (2003).  Disputed facts and determinations of witness credibility are within the province of the fact-finder.  *Id.* at 624–25, 128 S.W.3d at 425.

A prescriptive easement may be gained by one not in fee possession of the land by operation of law in a manner similar to adverse possession.  *Carson*, 354 Ark. at 625, 128 S.W.3d at 425.  Like adverse possession, prescriptive easements are not favored in the law because "they necessarily work corresponding losses or forfeitures in the rights of other persons."  *Id.* at 625, 128 S.W.3d at 426.  In Arkansas, it is generally required that one asserting an easement by prescription show by a preponderance of the evidence that one's

16

use has been adverse to the true owner and under a claim of right for the statutory period. *Carson*, 354 Ark. at 625, 128 S.W.3d at 426. The statutory period of seven years for adverse possession applies to prescriptive easements. *Neyland v. Hunter*, 282 Ark. 323, 668 S.W.2d 530 (1984); *see also* Ark. Code Ann. § 18-11-106 (Repl. 2015); Ark Code Ann. § 18-61-101 (Repl. 2015).

The use of wild, unenclosed, and unimproved land is presumed to be permissive until the persons using the land for passage, by their open and notorious conduct, demonstrate to the owner that they are claiming a right of passage. *Baker v. Bolin*, 2012 Ark. App. 141. Generally speaking, mere permissive use cannot ripen into an adverse claim without some overt act in addition to, or in connection with, the use that would make it clear to the owner of the property that an adverse use and claim are being exerted. *Id.*; *see Five Forks Hunting Club, LLC v. Nixon Fam. P'ship*, 2019 Ark. App. 371, 584 S.W.3d 685; *Clark ex rel. Clark v. Eubanks*, 2019 Ark. App. 49, 570 S.W.3d 506. Time alone will not suffice to transform permissive use into legal title. *Baysinger v. Biggers*, 100 Ark. App. 109, 265 S.W.3d 144 (2007). There must be some circumstance in addition to length of use to show that the use was adverse. *Eubanks*, *supra*. In other words, use of property may ripen into an easement by prescription, even if the initial usage began permissively, if it is shown that the usage continued openly for the statutory period after the landowner knew that it was being used adversely or under such circumstances that it would be presumed that the landowner knew it was adverse to his own interest. *Baysinger*, *supra*. An exception to this rule has been recognized, however, by which the long duration and circumstances of the use are themselves

17

sufficient to establish that the original restriction in the nature of a permissive use in favor of particular persons was abandoned through the long lapse of time. *Baker*, *supra*. Whether the use is adverse or permissive is a question of fact, and former decisions are rarely controlling on this factual issue. *Id.* The plaintiff bears the burden of showing by a preponderance of the evidence that there has been adverse, not permissive, use of the land in question. *Eubanks*, *supra*.

We have affirmed that there was sufficient continuous use where the use was found to be "more than fitful, irregular, occasional." *Carroll v. Shelton*, 2018 Ark. App. 181, at 7, 547 S.W.3d 94, 99. Moreover, we have held that mere temporary absences of a claimant from the land he or she adversely possessed or periods of vacancy of such land that evince no intention of abandonment do not interrupt the continuity of the adverse possession, provided the absence or vacancy does not extend over an unreasonable period. *Five Forks Hunting Club, LLC*, *supra*.

IV. *Whether the Public Has Obtained a Prescriptive Easement*

Initially, it is of note that RATS Entertainment claimed an easement by necessity in its amended complaint. However, at the trial of the matter, RATS Entertainment abandoned that claim.

On appeal, RATS Entertainment first argues that the circuit court erred in failing to find that the public has a prescriptive easement as to the disputed road in question. The elements for a public prescriptive easement are the same as for a private prescriptive easement except that the easement is extended to the general public and not merely to a party seeking

18

establishment of the easement. *Pop-A-Duck, Inc. v. Gardner*, 2022 Ark. App. 88, 642 S.W.3d 220. This court has held that when a roadway is used by the public openly, continuously, and adversely for a period of seven years, the public acquires an easement by prescription. *Id.* When testimony is in conflict or is evenly balanced, our appellate courts are guided by the circuit court's findings as long as the court has not erroneously applied the law. *Id.*

RATS Entertainment analogizes the facts of this case to those in *Gazaway v. Pugh*, 69 Ark. App. 297, 12 S.W.3d 662 (2000), and *Owners Association of Foxcroft Woods*, *supra*. RATS Entertainment recounts the testimony offered by Mr. Langley and Judge Nutt that was favorable to its position and complains that the "circuit court gave too much weight to Rogers and Ken Griffin, an employee of Rogers Land & Timber, LLC, on such issue." RATS Entertainment further cites this court's opinion in *Burley v. Bradley*, 2021 Ark. App. 105, 619 S.W.3d 49, and argues that the circuit court should have given greater weight to Judge Nutt's opinion that the disputed road was a public road. RATS Entertainment's arguments, however, lack merit and ignore the conflicting testimony and evidence credited by the circuit court.

It is the function of the finder of fact, and not the reviewing court, to evaluate the credibility of witnesses and to resolve any inconsistencies in the evidence. *Pop-A-Duck*, *supra*. Resolution of conflicts in testimony and assessment of witness credibility is for the finder of fact. *Id.* The court, as the fact-finder at a bench trial, may accept or reject any part of a witness's testimony, and its conclusion on credibility is binding on this court. *Id.*

19

Although RATS Entertainment compares this case to the facts in *Gazaway*, *supra*, and *Owners Association of Foxcroft Woods*, *supra*, we find those cases distinguishable. *Gazaway* involved access to a boat ramp and an area on the river that was accessed by a road across Gazaway's property. After Gazaway erected a gate on the gravel road, a group of hunters and fishermen joined together and brought suit against Gazaway to prevent him from interfering with their use of the road. The circuit court found that the public's use of the property was not permissive and granted a public easement over Gazaway's property. On appeal, Gazaway argued that the facts did not show that use of the road was adverse, and further, there was no evidence of hostility.

This court declared *Gazaway* "to be a very close case"; however, it found the testimony of Gary Cole, an Arkansas Game and Fish Commission enforcement officer, tipped the balance in favor of those seeking the easement. 69 Ark. App. at 303, 12 S.W.3d at 666. Cole testified that the road in question was used year round by sportsmen, with approximately seventy-five to one hundred vehicles using it on opening weekend of duck season and fifty to sixty vehicles using it during the week. As a result, this court held that the sheer number of hunters and fishermen present on the property suggested that not all of the use was by family or friends. *Id.* Accordingly, there was acquiescence to longtime use, and the presumption of permissive use had been overcome. *Id.*

Similarly, in *Owners Association of Foxcroft Woods*, *supra*, the supreme court held that the public's continuous use of what was known as southern drive for approximately fifteen years had ripened into a prescriptive easement. In that case, the parties had "stipulated to

20

the following: 'From the mid-1980s, the southern drive remained open, and was used by the public for ingress and egress, between Foxcroft Road on the east, and the commercial and multi-family properties to the west, on a regular basis until unattached barricades were put up in August of 1997.'" 346 Ark. at 362, 57 S.W.3d at 192. Citing *Gazaway* for the principle that acquiescence to longtime use by a large number of users of a road can ripen into a prescriptive easement in favor of the public, the supreme court held that the same principle held true under the facts of *Owners Association of Foxcroft Woods* and affirmed that the public had the benefit of a prescriptive easement over southern drive.

However, the facts in *Gazaway* and *Owners Association of Foxcroft Woods* are distinguishable from the present facts. Here, it is undisputed that Rogers's property is unenclosed and undeveloped; therefore, in the absence of the exceptions noted above, there is a presumption of permissive use. Unlike in *Gazaway* and *Owners Association of Foxcroft Woods*, it was only recently that there was a large number of members of the public traversing the disputed road. In fact, Mr. Rogers, Mr. Griffin, and Mr. Barkhimer testified that the gates that had been on RATS Entertainment's property and that provided access to the disputed road from RATS Entertainment's property had been historically locked since the parties had acquired their respective properties. Further, Mr. Simpson testified that those same gates that provided access to the disputed road had been locked from the mid-1980s until 2001. Mr. Langley, an owner of RATS Entertainment, is the only witness who testified that the gates located on RATS Entertainment's property had been unlocked and open since 2004. Mr. Rogers offered testimony that before RATS Entertainment's recent unlocking

21

and removal of the gates to allow their customers to access the disputed road, the use of the disputed road was mostly limited to hunters and loggers who had permission to use the disputed road. Under these facts, we cannot say that the circuit court erred in crediting the testimony of Mr. Rogers, Mr. Griffin, Mr. Barkhimer, and Mr. Simpson over Mr. Langley.

RATS Entertainment complains that our decision in *Burley*, *supra*, required the circuit court to credit Judge Nutt's opinion that he would consider the disputed road a "public road" because it had "been open to the public for years." We disagree. In *Burley*, we affirmed a circuit court's decision that the disputed road was not a county road. In doing so, we noted that the circuit court had relied on the testimony of a current Union County judge and multiple former Union County judges that a disputed road was not a county road and had never been maintained by the county during their tenure. Citing our standard of review that we give great deference to the circuit court's findings of fact, we held that we could not say "that the circuit court clearly erred in affording great weight to the testimony of county officials who have collectively held the position of Union County judge from 1991 to the present and whose function as judge largely involves the management and operation of the county-road department." *Burley*, 2021 Ark. App. 105, at 8, 619 S.W.3d at 55.

Here, although we acknowledge that Judge Nutt did offer his opinion that he would consider the disputed road a "public road" because it had "been open to the public for years," RATS Entertainment ignores the remainder of Judge Nutt's testimony and of the other witnesses' testimony that contradicts this opinion and that the circuit court obviously credited. Judge Nutt testified that the county map designated a number for the disputed

22

road only for "911 purposes to identify the road in case of an emergency" and confirmed that the road had never been dedicated as a "County Road." Nutt also admitted that he was aware of a gate that was locked and prevented access to the disputed road. Although he testified that he thought the county had worked on the disputed road once or twice over the past twenty years, he did not provide any details as to what work the county performed. On the other hand, Mr. Rogers testified that he had acquired title to his property and the disputed road in 2004 and that the special warranty deed specifically conveyed to him "all roads, bridges and other infrastructure improvements thereon." This special warranty deed was admitted into evidence. Moreover, Mr. Rogers, Mr. Griffin, Mr. Barkhimer, and Mr. Simpson testified that the gates that had been on RATS Entertainment's property and that provided access to the disputed road from RATS Entertainment's property had been historically locked since the mid-1980s until only recently. In light of all the testimony and evidence presented and under our standard of review, we cannot find the circuit court's denial of a prescriptive easement for the benefit of the public clearly erroneous. Accordingly, we must affirm.

V. *Whether RATS Entertainment Had Obtained a Prescriptive Easement*

Alternatively, RATS Entertainment argues that the circuit court erred in failing to find that RATS Entertainment had an easement across the disputed road. RATS Entertainment again recounts Mr. Langley's testimony that he had utilized and maintained the disputed road for almost twenty years. It further states that prior to Rogers recently erecting gates to prevent access to the disputed road, Rogers failed to take any action to

23

prevent Mr. Langley or others from using the disputed road. As such, RATS Entertainment argues that its use of the disputed "road was open, adverse, and hostile to [Rogers]" and that we must reverse.

Rogers argued in their responsive brief that any use by RATS Entertainment of the disputed road on its unenclosed and unimproved property was merely permissive. Mr. Rogers testified that he did not have an issue with loggers, gravel trucks, or hunters traversing the disputed road and that he gave them permission for that use. However, when he learned that RATS Entertainment intended to allow its patrons to utilize the disputed road, Mr. Rogers erected gates to prevent this use. Recall, overt activity on the part of the user is necessary to make it clear to the owner of the property that an adverse use and claim are being exerted and that mere permissive use of an easement cannot ripen into an adverse claim without clear action, which places the owner on notice. *Owners Association of Foxcroft Woods*, *supra*. Here, although Mr. Langley testified that he has maintained the disputed road for over twenty years, Mr. Rogers and Mr. Griffin both testified that they were aware of RATS Entertainment working on the disputed road only within the last couple of years, which meant that Mr. Langley's overt activity did not satisfy the necessary seven-year statutory period. Mr. Langley further admitted at trial that the invoices he submitted in support of his claim that he had been maintaining the disputed road were all within seven years, but he claimed that he did not keep any records further back. However, the circuit court was not required to credit Mr. Langley's self-serving testimony. As stated above in the first point, it is the function of the finder of fact, and not the reviewing court, to evaluate the credibility

of witnesses and to resolve any inconsistencies in the evidence. *Pop-A-Duck*, *supra*. Here, the circuit court credited the testimony offered by the other witnesses in this case over that of Mr. Langley. Accordingly, we cannot say that the circuit court was clearly erroneous in finding that RATS Entertainment failed to meet its burden of showing that it had a prescriptive easement as to the disputed road and affirm.

Affirmed.

HARRISON, C.J., and GLADWIN, J., agree.

*Law Offices of Shepherd & Shepherd, P.A.*, by: *Matthew J. Shepherd* and *John Thomas Shepherd*, for appellant.

*Stone & Sawyer, PLLC*, by: *R. Jeffrey Sawyer*, for appellees.